IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAKUR D. GANNAWAY,                    :    CIVIL ACTION
                                       :    No. 12-1156
        Plaintiff,                     :
                                       :
        v.                             :
                                       :
PRIME CARE MEDICAL, INC., et al.       :
                                       :
        Defendants.                    :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          December 21, 2015

I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY................. 4

II.   STANDARD OF REVIEW....................................... 9

III.  DISCUSSION.............................................. 10

      A.   PrimeCare Medical Defendants' Motion for Summary
           Judgment (ECF Nos. 92 & 93)........................ 10

           1.   Eighth Amendment Violation Based on Inadequate
                Medical Care Against Defendants Dillman and
                Gessner....................................... 15

           2.   Eighth Amendment Violation Based on Inadequate
                Medical Care Against Defendant
                PrimeCare Medical............................. 25

           3.   State Law Negligence Claim Based on Inadequate
                Medical Care Against Defendants PrimeCare
                Medical, Dillman, and Gessner................. 27

      B.   Defendants ADAPPT, Inc., and William Tillman's Motion
           for Summary Judgment (ECF Nos. 97 & 98)............ 28

      C.   Defendant Berks County Public Defender's Office's
           Motion for Summary Judgment (ECF No. 99)........... 33

D.   Defendant Osmer Deming's Motion for Summary Judgment (ECF No. 102)....................................... 40

    1.   Section 1983 Claims Against Defendant Deming... 44

    2.   Legal Malpractice Claim Against Defendant Deming......................................... 46

E.   Commonwealth Defendants' Motion for Summary Judgment (ECF Nos. 113 & 114).............................. 49

    1.   Eighth Amendment Claim Against All Commonwealth Defendants.................................... 64

    2.   Violation of the Due Process Clause of the Fourteenth Amendment Claim Against All Commonwealth Defendants....................... 74

    3.   First Amendment Retaliation Claim Against All Commonwealth Defendants....................... 80

    4.   Violation of Right of Access to Courts Claim Against All Commonwealth Defendants.................................... 85

IV.  PLAINTIFF'S REPEATED REQUESTS FOR COUNSEL............... 88

V.   REMAINING DEFENDANTS................................... 90

VI.  CONCLUSION............................................ 94

Plaintiff Shakur Gannaway, currently an inmate at Pennsylvania State Correctional Institution ("SCI") at Rockview, brings this pro se civil rights action under 42 U.S.C. § 1983 against seventy-four defendants, including fifty-four agencies and employees of the Commonwealth of Pennsylvania, private companies and healthcare professionals contracted to provide medical services to the state correctional institutions, and

other non-state defendants, including his court-appointed
attorneys.

Although Plaintiff's Amended Complaint is
disorganized, rambling, and often difficult to decipher, the
heart of Plaintiff's allegations is that he received inadequate
medical treatment throughout his incarceration in violation of
the Eighth Amendment to the United States Constitution and state
medical malpractice laws. Plaintiff also appears to bring
several other constitutional claims under § 1983, including
claims concerning First Amendment retaliation, violations of due
process, and denial of access to the courts.

The Court ordered Plaintiff to be deposed, and
following Plaintiff's deposition on June 19, 2014, Defendants
moved for summary judgment, attaching as exhibits Plaintiff's
deposition, entire file of medical records, and entire grievance
file, among other things. After the Court granted Plaintiff
several extensions to respond to these motions, Plaintiff has
finally submitted "objections," which the Court will construe as
responses to Defendants' motions. Accordingly, the five pending
summary judgment motions are now ripe for disposition. After an
exhaustive review of the record, and for the reasons set forth
below, the Court will grant Defendants' motions for summary
judgment as to all claims against all defendants.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff is currently in the custody of the Pennsylvania Department of Corrections ("DOC"), serving a sentence of fifteen to thirty years for a conviction related to a 2009 armed robbery. Before his criminal trial, Plaintiff was detained at the Berks County Prison to await the disposition of the robbery charges and also pursuant to a probation/parole detainer attached to an earlier offense. Still before then, Plaintiff, while on parole for yet another offense, was assigned to a treatment program at ADAPPT House, a residential facility contracted by the DOC.

Because Plaintiff brings claims against a myriad of defendants concerning a legion of events, the facts pertinent to each claim will be addressed in the discussions of Defendants' summary judgment motions below.

Plaintiff initiated this action on March 5, 2012, by filing an application to proceed in forma pauperis. ECF No. 1. On March 29, 2012, the Court granted Plaintiff's application, requiring him to pay the full filing fee in installments pursuant to 28 U.S.C. § 1915. ECF No. 4. In the same order, the Court directed Plaintiff to file an Amended Complaint, noting that the statute of limitations limited Plaintiff to raising claims that occurred within the two-year period before March 5, 2012, and directing Plaintiff to describe as clearly, briefly,

4

and legibly as possible the specific events that violated his constitutional rights, how each defendant was involved in his claims, and the harm he suffered from each violation. Id. at 2. Thereafter, Plaintiff asked the Court for several of extensions of time to file an Amended Complaint, which the Court granted. See ECF Nos. 10, 11, 14. Plaintiff finally filed his Amended Complaint on May 13, 2013. ECF No. 15. In his Amended Complaint, Plaintiff is unclear as to his requested relief.

After the U.S. Marshal served the defendants,[1] four motions to dismiss were filed.[2] On April 25, 2014, the Court denied these motions without prejudice, granted Defendants leave to take Plaintiff's deposition so Defendants could respond accurately to Plaintiff's allegations, and set deadlines for Defendants to file motions for summary judgment and Plaintiff to

---

[1]     Summonses were returned unexecuted for the following defendants: Jeffrey Ditty, Fox, Emil Michael Kazor, Gail Kelly, Teresa Law, Lizhong, Marsh, John A. Palakovich, April Palumbo Rasch, Mark Silidker, Richard Southers, Weaver, Doris Weaver, MD Peter Binnion, Fisher, Symons, Goubran Theodore Vourstand, and Ted W. Williams. Other individuals, who were served but have not had counsel enter an appearance on their behalf, include Nicholas Stroumbakis and William Bispels. The following defendants appear not to have been served: "(PHS Correctional Healthcare) Most of State Prison," Bernard, Sgt. Vargas, Deputy Horton, Deputy, C/O Moore, Kitchen Worker Luss, and E. Mosser. In addition, two Jane Does and a John Doe have not been identified.

[2]     The motions to dismiss were filed by (1) PrimeCare Medical, Inc., Paula Dillman, and Victoria Gessner (ECF No. 29); (2) Berks County Public Defender's Office (ECF No. 33); (3) ADAPPT, Inc. and William Tillman (ECF No. 38); and (4) Osmer Deming (ECF No. 49).

respond thereto. ECF No. 63. These deadlines were subsequently extended. ECF No. 77.

On May 1, 2014, the Commonwealth Defendants filed a Motion to Dismiss. ECF No. 66. The Court granted the motion in part, dismissing SCI-Camp Hill, SCI-Greene, and SCI-Rockview, as well as all claims against those Commonwealth Defendants sued in their official capacities. ECF No. 74.

Plaintiff's deposition was taken on June 19, 2014, and various defendants filed motions for summary judgment thereafter. Specifically, summary judgment motions were filed by (1) PrimeCare Medical, Inc., Paula Dillman, and Victoria Gessner, M.D. (collectively, "PrimeCare Medical Defendants") (ECF Nos. 92 & 93); (2) ADAPPT, Inc., and William Tillman (collectively, the "ADAPPT Defendants") (ECF Nos. 97 & 98); (3) the Berks County Public Defender's Office (ECF No. 99 & 138); (4) Osmer Deming (ECF No. 102); and (5) the Commonwealth Defendants (ECF No. 113 & 114).

Plaintiff initially filed two responses to the PrimeCare Medical Defendants' motion (ECF Nos. 104 & 105) but did not file responses to the others. After the most recent status and scheduling conference held on July 15, 2015, the Court directed the Clerk of Court to serve copies of all of the pending summary judgment motions, together with their supporting documents, to Plaintiff. See ECF No. 128. The Court then gave

Plaintiff until September 14, 2015, to file responses to Defendant's motions for summary judgment. Id.

Thereafter, Plaintiff submitted a series of requests for extensions of time to respond to Defendants' pending motions for summary judgment and for appointment of counsel. ECF Nos. 133, 135, 136. By Order dated October 13, 2015, the Court denied these requests, noting that the Court had previously granted Plaintiff a number of extensions to file his responses to Defendants' motions for summary judgment and that some of the Defendants' motions had been pending for nearly one year. ECF No. 141. The Court also explained that it would reassess Plaintiff's request for appointment of counsel after the parties fully briefed the summary judgment motions. Id. Even after this Order, Plaintiff submitted an additional request for an extension of time and appointment of counsel, purportedly due to mail tampering at SCI-Rockview and his ongoing medical issues. ECF No. 145.

Although Plaintiff requested and the Court denied an extension of time to respond to Defendants' motion for summary judgment, Plaintiff recently filed several documents which he calls "objections" to Defendants' summary judgment motions. ECF Nos. 132, 137, 143, 144, 146, 147, 148.[3] The Court will treat

---

[3]      The filings at ECF No. 143 and 146 appear to be the same document. Although the title of the document suggests that

these documents as Plaintiff's opposition to the pending summary
judgment motions. Plaintiff also recently filed a document which
he titles "Request for Summary Judgment, Default Against SCI-
Rockview Defendants for the Following Reasons," ECF No. 149,
which the Court will construe as an additional response to the
Defendants' summary judgment motions.[4]

---

it is a response to only the Public Defender's Office's and the
PrimeCare Medical Defendants' motions for summary judgment, text
within the document appears to address all of the defendants in
this case. The Court will therefore treat this filing as a
response to all five pending motions for summary judgment.

[4]     The Court will not construe Plaintiff's most recent
filing as his own motion for summary judgment, because it does
not comply with any of the requirements outlined in Federal Rule
of Civil Procedure 56. For instance, Plaintiff does not
"identify[] each claim or defense--or part of each claim or
defense--on which summary judgment is sought," Fed. R. Civ. P.
56(a), or support his factual positions by "citing to particular
parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A).

        Although the Court indicated in an earlier order that,
in lieu of responding to defendants' motions for summary
judgment, Plaintiff could file a motion seeking whatever
discovery he may need to respond to the motions, ECF No. 63,
Plaintiff's recent filings make no showing as to why additional
discovery is warranted. He seems to ask the Court for a physical
examination pursuant to Federal Rule of Civil Procedure 35, see,
e.g., ECF Nos. 143 at 5 & 150, but the defendants have not
requested such an examination. Rule 35 provides that a party may
move for the physical or mental examination of the opposing
party. Fed. R. Civ. P. 35(a). It does not permit a party to seek
his own medical examination, and a prisoner cannot use Rule 35
as a mechanism for obtaining a second medical opinion when he
disagrees with the course of treatment prescribed by prison
medical personnel. He also appears to seek his medical and legal
records, see, e.g., ECF No. 149 at 2, but such records were
attached as exhibits to Defendants' motions for summary judgment
or are in Plaintiff's possession.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

9

A document filed pro se is to be "liberally construed" and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Courts are especially "flexible when dealing with imprisoned pro se litigants [who] often lack the resources and freedom necessary to comply with the technical rules of modern litigation." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244-45 (3d Cir. 2013). However, in summary judgment motion practice, "[t]he burden remains on the nonmoving party, not the court, to identify sufficient facts from the record that show the existence of a genuine issue for trial." St. Louis v. Morris, 573 F. Supp. 2d. 846, 852 (D. Del. 2008) (providing the standard for analyzing a defendant's motion for summary judgment against a pro se plaintiff). And "[a]t the end of the day, [imprisoned pro se litigants] cannot flout procedural rules--they must abide by the same rules that apply to all other litigants." Mala, 704 F.3d at 245.

## III. DISCUSSION

A. <u>PrimeCare Medical Defendants' Motion for Summary Judgment (ECF Nos. 92 & 93)</u>

The Court first addresses the PrimeCare Medical Defendants' summary judgment motion. ECF Nos. 92 & 93. The facts

pertinent to Plaintiff's claims against the PrimeCare Medical
Defendants appear to be as follows:

Plaintiff was incarcerated at Berks County Prison from
May 25, 2009, to August 24, 2010, while awaiting the disposition
of the robbery charges against him and also pursuant to a
probation/parole detainer attached to an earlier offense.
PrimeCare Defs.' Mot. Summ. J. Ex. A, Gannaway Dep. at 80:13-16,
108:11-22, June 19, 2014 [hereinafter "Gannaway Dep."]. During
all relevant times, the prison contracted a private vendor,
Defendant PrimeCare Medical, Inc., to provide medical services
to inmates. PrimeCare Defs.' Statement of Undisputed Facts ¶ 8.
The crux of Plaintiff's claims against the PrimeCare Medical
Defendants concerns some sort of "internal stitch" or "medical
device" allegedly inserted prior to his incarceration at Berks
County Prison, which Plaintiff claims requires surgical removal.
Am. Compl. ¶¶ 6, 12, 17, 20, 23, 29, 31-32; Gannaway Dep. at
67:1-20. This stitch or device was purportedly left in
Plaintiff's abdomen during a surgery he underwent after he was
stabbed with a knife roughly fifteen years ago and has not been
removed to date. Gannaway Dep. at 120:22-121:19. Plaintiff
alleges that he suffers pain, as well as other symptoms
including constipation and difficulty breathing, as a result of
this "internal stitch." Gannaway Dep. at 84:3-17.

During his deposition, Plaintiff testified that he had "a lot of physicals while [he] was at Berks County" and was "seen by a lot of people." Id. at 85:21-24. Indeed, during his detention at Berks County Prison, which spanned a period of roughly one year and three months, Plaintiff submitted at least thirty-six sick call requests, all of which were addressed in some form by PrimeCare Medical staff. See generally PrimeCare Defs.' Mot. Summ. J. Ex. C, Sick Call Requests. Specifically, Plaintiff was seen by a medical provider in response to at least nine of these requests. See id. Ex. D, Medical Sick Call Notes. During his deposition in another lawsuit that he filed against the Berks County Prison, Plaintiff admitted that he was seen by PrimeCare Medical staff about thirty to forty times during his incarceration at Berks County Prison, and during certain time periods, he was seen by the medical department on a daily basis. See id. Ex. B, Gannaway Dep. in Action Nos. 09-4501 & 09-2688, at 235:19-24, 265:17-266:1, June 14-15, 2010.

While at Berks County Prison, Plaintiff was given laxatives for his complaints of constipation. PrimeCare Defs.' Mot. Summ. J. Ex. A, Gannaway Dep. at 102:21-22. PrimeCare Medical staff also ordered various medical tests for Plaintiff, including blood tests, urine analysis, analysis of stool samples, and x-rays of Plaintiff's abdomen. Id. at 102:23-103:6. Overall, Plaintiff was prescribed and given medication for his

various complaints nearly every day during his incarceration at Berks County Prison. PrimeCare Defs.' Mot. Summ. J. Ex. F, Medication Admin. R.

At times, Plaintiff was noncompliant with treatment prescribed by the PrimeCare Medical staff. For instance, he refused sick appointments or was unavailable when called by medical staff on at least nine occasions. PrimeCare Defs.' Mot. Summ. J. Ex. E, PrimeCare Med. Chart Notes. Plaintiff also complained of blood in his stool, but consistently refused to provide medical staff with stool samples for analysis. Id.

During his deposition, Plaintiff admitted that he cannot specifically recall the two PrimeCare Medical employees he named in his Amended Complaint, Defendants Dillman and Gessner, and cannot offer any factual evidence that either violated his constitutional rights. PrimeCare Defs.' Mot. Summ. J. Ex. A, Gannaway Dep. at 86:10-88:23.

Although less than pellucid from Plaintiff's Amended Complaint, based on these facts, the Court will construe Plaintiff's claims against the PrimeCare Medical Defendants as (1) a claim for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution,[5] or in the alternative, (2) state law claims

---

[5]     The Court notes that Plaintiff raised similar constitutional claims concerning the medical care he received at

of medical negligence. The PrimeCare Medical Defendants move for
summary judgment on both claims. Plaintiff opposes summary
judgment, claiming that Defendants Dillman and Gessner were "in
charge" and "fail[ed] t[o] supervise their staff," so "Dr[.]
[sic] Paula Dillman and Dr[.] Victoria Gessner should provide or
mention who they instructed on the follow-up [on Plaintiff's
internal stitch] if they claim they saw the records and only
prescribe medication then they should be accountable of
deliberate indifference." Pl.'s "Objection to the Public
Defender's and the PrimeCare Medical Inc. Summary Judgment Being
Granted with the Following Circumstances of Plaintiff Learning
the Outcome of Going to the Temple University Hospital at Temple
Between 10/1/15 and 10/15/15" ¶ 2, ECF No. 143 [hereinafter
"Pl.'s Obj."].

---

Berks County Prison in Gannaway v. Berks County Prison, No. 09-
4501. In that action, Plaintiff's claim of deliberate
indifference to his medical needs was dismissed on summary
judgment. See Gannaway v. Berks Cty. Prison, No. 09-4501, 2011
WL 1196905, at *10 (E.D. Pa. Mar. 31, 2011), aff'd 439 F. App'x
86 (3d Cir. 2011). Accordingly, Plaintiff's claims here may be
barred by the doctrines of res judicata or collateral estoppel.
For the sake of completeness, however, the Court will again
consider the merits of these claims here.

1.   Eighth Amendment Violation Based on Inadequate
     Medical Care Against Defendants Dillman and
     Gessner

As a threshold matter, it is unclear whether Plaintiff
has exhausted administrative procedures as required by the
Prison Litigation Reform Act of 1995 (PLRA) with respect to his
claims against the PrimeCare Medical Defendants. The PLRA
prohibits an inmate from bringing a civil rights suit alleging
specific acts of unconstitutional conduct by prison officials
until the inmate has exhausted available administrative
remedies. 42 U.S.C. § 1997e(a). The exhaustion requirement of
the PLRA applies to grievance procedures "regardless of the
relief offered by the administrative procedures." Booth v.
Churner, 532 U.S. 731, 741 (2001); see also Nyhuis v. Reno, 204
F.3d 65, 67 (3d Cir. 2000) (explaining that "the PLRA amended
§ 1997e(a) in such a way as to make exhaustion of all
administrative remedies mandatory--whether or not they provide
the inmate-plaintiff with the relief he says he desires in his
federal action"). During his deposition, Plaintiff claimed that
he filed grievances as required by the PLRA, Gannaway Dep. at
52:19-24, but Plaintiff has not put forth any other evidence to
establish that he fully exhausted administrative procedures,
such as all levels of administrative appeal, with respect to all
of his medical care claims. Even though Plaintiff is no longer
incarcerated at Berks County Prison and is now held at SCI-

Rockview, in at least one nonprecedential case, "the Third Circuit has found that transfer to another prison facility does not excuse the PLRA's exhaustion requirement." In re Bayside Prison Litig., No. 97-5127, 2008 WL 2387324, at *4 (D.N.J. May 19, 2008) (citing Williamson v. Wexford Health Sources, Inc., 131 F. App'x 888, 890 (3d Cir. 2005) (nonprecedential)). In their motion for summary judgment, the PrimeCare Medical Defendants have not addressed the issue of exhaustion. Therefore, Plaintiff's Eighth Amendment claims may not be properly before the Court.

However, for the sake of completeness--and because the Third Circuit has held that exhaustion under the PLRA is not a jurisdictional requirement, such that failure to comply with § 1997(e) would deprive the federal courts of subject matter jurisdiction, Nyhuis, 204 F.3d at 69 n.4--the Court will consider Plaintiff's Eighth Amendment Claims on the merits. The Court also notes that 42 U.S.C. § 1997e(c)(2), enacted as part of the PLRA, provides that

> [i]n the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

Plaintiff brings a claim for inadequate medical care in violation of the Eighth Amendment under 42 U.S.C. § 1983. To

16

prevail on a § 1983 claim, the plaintiff must establish two elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993). It is well-established that civil rights claims cannot be premised on a theory of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Thus, individual liability can be imposed only if the state actor played an "affirmative part" in the alleged misconduct, either through personal direction of or actual knowledge and acquiescence in the deprivation. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986) (quoting Rizzo v. Goode, 423 U.S. 362, 377 (1976)). Alleging a mere hypothesis that an individual defendant had personal knowledge of or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. See Rode, 845 F.2d at 1208.

Here, Defendants Dillman and Gessner, although employed by a private healthcare provider, were acting under color of state law. In West v. Atkins, the Supreme Court ruled that private physicians contracted to perform services to a state prison within prison confines are acting under color of

17

state law for the purposes of a § 1983 claim. 487 U.S. 42, 57

(1988). The next question is therefore whether Defendants

Dillman or Gessner were directly involved in or had actual

knowledge and acquiescence in an Eighth Amendment violation.

To establish a violation of the Eighth Amendment's ban

on cruel and unusual punishment based on medical care,[6] a

---

[6]      It appears that Plaintiff was detained in the Berks
County Prison as both a pretrial detainee and pursuant to a
probation/parole detainer attached to an earlier offense. The
summary judgment record does not make clear Plaintiff's status
at the time of the events at issue in this case. The Third
Circuit noted the same issue in Plaintiff's earlier case
concerning his time at Berks County Prison, Gannaway v. Berks
County Prison, and stated as follows:

> Gannaway was detained in the [Berks County
> Prison] both as a pretrial detainee and pursuant
> to a probation/parole detainer that activated
> upon his arrest. The record fails to make clear
> the resolution of that detainer, and case law has
> not definitively addressed whether a prisoner
> awaiting a hearing on a detainer falls under the
> protection of the Eighth or Fourteenth
> Amendments. See Palmer v. Marion Cty., 327 F.3d
> 588, 592-93 (7th Cir. 2003); see also Williams v.
> Mussomelli, 722 F.2d 1130, 1133 (3d Cir.1983)
> ("It is established that pretrial detainees are
> protected by the due process clause of the fifth
> and fourteenth amendments, not the cruel and
> unusual punishment clause of the eighth
> amendment." (citing Bell v. Wolfish, 441 U.S.
> 520, 535 n.16 (1979))). But we need not
> definitively decide the issue, either generally
> or pertaining exclusively to Gannaway's status.
> The Fourteenth Amendment grants at least as much
> protection as does the Eighth Amendment. Natale
> v. Camden Cty. Corr. Facility, 318 F.3d 575, 581
> (3d Cir. 2003). At a bare minimum, then, Gannaway
> must meet the "deliberate indifference" test of

plaintiff must show deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). To act with deliberate indifference to such a medical need is to recklessly disregard "a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 839 (1998); Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009). Deliberate indifference may be shown by "intentionally denying or delaying medical care." Giles, 571 at 330 (quoting Estelle, 429 U.S. 104). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Id. (quoting Farmer, 511 U.S. at 843).

The deliberate indifference test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second-guess the propriety or

---

Estelle v. Gamble, 429 U.S. 97, 105 (1976), in order to succeed. Natale, 318 F.3d at 582.

439 F. App'x at 89 n.2. Accordingly, the Court will also analyze Plaintiff's claims against the PrimeCare Medical Defendants under the Eighth Amendment in this case.

adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'" Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)). Under this test, "courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." Clark v. Doe, No. 99-5616, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000). Accordingly, "mere allegations of malpractice do not raise issues of constitutional import," nor does an inmate's "mere disagreement as to the proper medical treatment." Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 346.

Here, the record shows that the PrimeCare Medical Defendants consistently provided Plaintiff with medical care throughout his time at Berks County Prison. Plaintiff's treatment included examinations and visits by doctors and other medical staff, blood tests, urine and stool sample analysis, x-rays, and the disbursement of various over-the-counter and prescription medications. During his deposition, Plaintiff could not recall Defendants Dillman or Gessner, much less point to specific deficiencies or omissions in the treatment these medical professionals provided to him. See Gannaway Dep. at 86:10-15 ("Q: Do you remember Nurse Dillman? A: I only remember her signature. I don't remember her physical features, no. Q: Would you be able to pick her out of a line up? A: No, I would

20

not."); id. at 86:22-24 ("Q: Would you be able to pick Dr. Gessner out of a line up? A: No, I would not. Not at all."). He stated that he named them as Defendants in this case only because their names appeared on some of the medical records he had in his possession. Id. at 86:16-21 ("Q: How is it that you know she [Nurse Dillman] was involved in your care? A: I think it was the documentation with her signature on it, and Victoria Gessner, those was [sic] the individuals' names that was on some paper I had.").

Plaintiff seems to allege that Defendants Dillman and Gessner held a supervisory role in the medical department. See Gannaway Dep. at 106:4-11 ("I could say these individuals that you're describing, Paula Dillman and Mrs. Victoria Gessner, they like--these individuals is pawns under them. I know they was in charge because these individuals came by on numerous occasions while I was in restricted housing unit and was pleading to say, give him some food, do this, or do that."); Pl.'s Obj. ¶ 2 (suggesting that these individuals were supervisors). However, he has failed to present any evidence raising a genuine dispute of material fact concerning whether they knew of and acquiesced in the deprivation. And Plaintiff has not put forth any evidence to establish that anyone else in the prison medical department, such as an employee who worked under Defendants Dillman and

Gessner, was deliberately indifferent to Plaintiff's health concerns.

Further, in his "objections" to the PrimeCare Medical Defendants' motion, Plaintiff has failed to present any evidence that he suffered from a "serious medical condition" while at Berks County Prison. He claims complications that resulted from an "internal stitch" of some sort, but he does not point to any evidence in the record to help clarify what this "internal stitch" is, how it relates to the symptoms of which he complains, and whether the stitch actually requires surgical removal. Indeed, Plaintiff claims that he did not even know about the stitch until a doctor at SCI-Rockview pointed it out to him in 2011. Pl.'s Obj. ¶ 1. The Court will not second guess treatment provided by the prison based on such vague allegations.

Plaintiff also alleges that he lost forty-five pounds while incarcerated at Berks County Prison, because he refused to eat the "food loaf" provided to him while in the Restrictive Housing Unit ("RHU"). Gannaway Dep. at 87:23-88:21, 91:1-15. He therefore suggests that PrimeCare Medical staff should have ordered prison officials to feed him a "shake" or another type of diet. Id. at 91:8-11. However, PrimeCare Medical records show that Plaintiff weighed 176 pounds when he entered Berks County Prison in May 2009, weighed 176 pounds in November 2009, and

weighed 174.5 pounds on December 10, 2009--on which date he
complained to medical staff that he had lost thirty pounds.
PrimeCare Defs.' Mot. Summ. J. Ex. E, PrimeCare Medical Chart
Notes at 1, 8. Moreover, Plaintiff has not shown that PrimeCare
Medical staff--much less Defendants Dillman and Gessner--had any
decisionmaking authority with respect to the food provisions
proffered to prisoners in disciplinary confinement, so as to
raise an issue of fact for trial.[7]

---

[7]    In an earlier action brought by Plaintiff, Gannaway v.
Berks County Prison, No. 09-4501, which concerned the same time
period as the instant case, Plaintiff claimed that service of
the nutra-loaf while in the disciplinary unit constituted cruel
and unusual punishment. 2011 WL 1196905, at *4 (E.D. Pa. Mar.
31, 2011). In that case, the Court held as follows:

> In Plaintiff's complaint, he makes
> various arguments as to why the serving of nutra-
> loaf is cruel and unusual punishment. Plaintiff's
> main complaint is that he was effectively starved
> while in the D-Unit because he was fed nutra-loaf
> five days a week, but he could not eat it because
> it made him sick. Plaintiff's assertion that he
> was starved by Defendants is negated by his own
> testimony because he admits that he was, indeed,
> served the nutra-loaf while in the D-Unit--he
> simply did not eat it because he thought it was
> unappetizing and it made him nauseous.
>
>     "In the context of an inmate's diet,
> the Eighth Amendment requires only that inmates
> be provided food that is adequate to maintain
> health, and served in a sanitary manner, not that
> food be appetizing." Maldonado v. McFaden, No.
> 94-1477, 1994 U.S. Dist. LEXIS 16837, at *11
> (E.D. Pa. Nov. 23, 1994); see also Collins v.
> Klotz, No. 92-3772, 1994 U.S. Dist. LEXIS 8980,
> at *13-14 (E.D. Pa. July 1, 1994). Various courts
> have found that "the replacement of an inmate's

For the above reasons, the PrimeCare Medical Defendant's motion for summary judgment will be granted as to this claim. Plaintiff's Eighth Amendment claim against Defendants Dillman and Gessner will be dismissed.

---

diet with a food loaf that [is] nutritionally similar or identical to the inmate's regular diet [does] not violate the Eighth Amendment." Hinterlong v. Hill, No. 05-5514, 2006 U.S. Dist. LEXIS 54952, at *16 (E.D. Pa. Aug. 8, 2006) (citing Maldonado, 1994 U.S. Dist. LEXIS 16837, at *12-14; Collins, 1994 U.S. Dist. LEXIS 8980, at *4 n.3, *14). In Maldonado, the court held that "[a] temporary food loaf diet that fully comports with the nutritional and caloric requirements of [an inmate's] specific dietary needs does not constitute an extreme deprivation denying the minimal civilized measure of life's necessities. [The inmate's] distaste for the unappetizing food loaf diet, while under-standable, is not, by itself, constitutionally actionable." 1994 U.S. Dist. LEXIS 16837, at *14.

Although Plaintiff alleges that he did not enjoy eating nutra-loaf and that it made him sick, he never states that the food presented an immediate danger to his health or well-being. Additionally, Defendants point out that Plaintiff never alerted either [the Warden] or his Deputies of the fact that Plaintiff threw-up after eating the nutra-loaf. Plaintiff does not controvert this evidence. Moreover, Plaintiff does not allege that he suffered any medical conditions or other adverse consequences as a result of eating the nutra-loaf, and his medical records do not reveal any such issues. As such, neither the Warden nor his Deputies could have fed Plaintiff nutra-loaf with the culpable state of mind necessary to make out a claim for cruel and unusual punishment.

Id. at *4-5 (some internal citations omitted).

24

>    2.   Eighth Amendment Violation Based on Inadequate
>         Medical Care Against Defendant PrimeCare Medical

The Court next turns to Plaintiff's claims against
Defendant PrimeCare Medical and the question whether actions by
PrimeCare employees can be attributed to PrimeCare Medical
itself. Under § 1983, a private corporation contracted by a
prison to provide healthcare for inmates cannot be held liable
on a respondeat superior theory; rather, pursuant to Monell v.
Department of Social Services, 436 U.S. 658, 690-92 (1978), a
private corporation can be held liable for constitutional
violations only if it has a custom or policy exhibiting
deliberate indifference to a prisoner's serious medical needs.
Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 583-84 (3d
Cir. 2003); see also Weigher v. Prison Health Servs., 402 F.
App'x 668, 669-70 (3d Cir. 2010) (nonprecedential) (noting that
a private corporation providing medical service at a state
correctional facility cannot be held liable under a theory of
respondeat superior in a § 1983 suit).

    Under the Monell line of jurisprudence, there are
three situations where acts of a government employee may be
deemed to be the result of a policy or custom of the
governmental entity for whom the employee works, thereby
rendering the entity liable under § 1983. Natale, 318 F.3d at
584. The first occurs when "the appropriate officer or entity

promulgates a generally applicable statement of policy and the
subsequent act complained of is simply an implementation of that
policy." Id. (quoting Bd. of Cty. Comm'rs of Bryan Cty. v.
Brown, 520 U.S. 397, 417 (1997) (Souter, J., dissenting)). The
second occurs when "no rule has been announced as policy but
federal law has been violated by an act of the policymaker
itself." Id. (quoting Bryan County, 520 U.S. at 417). Third, a
policy or custom may exist where "the policymaker has failed to
act affirmatively at all, [though] the need to take some action
to control the agents of the government 'is so obvious, and the
inadequacy of existing practice so likely to result in the
violation of constitutional rights, that the policymaker can
reasonably be said to have been deliberately indifferent to the
need.'" Id. (quoting Bryan County, 520 U.S. at 417-18).

        Here, Plaintiff has not pointed to anything in the
record to support an allegation of deliberate indifference on
the part of the named PrimeCare Medical employees, Defendants
Dillman and Gessner. Moreover, Plaintiff makes no allegations
concerning policies or procedures issued by PrimeCare Medical
with regard to the provision of medical care at Berks County
Prison. Accordingly, Plaintiff's § 1983 claim against PrimeCare
Medical fails, and summary judgment will be granted in favor of
Defendant PrimeCare Medical.

3.   <u>State Law Negligence Claim Based on Inadequate Medical Care Against Defendants PrimeCare Medical, Dillman, and Gessner</u>

The Court will also construe certain allegations raised in Plaintiff's Amended Complaint and at his deposition as a state law claim for medical negligence against Defendants PrimeCare Medical, Dillman, and Gessner. See, e.g., Am. Compl. ¶ 9; Gannaway Dep. at 147:23-25, 158:3-6 (alleging "negligent" conduct or "negligence" on the part of the PrimeCare Medical Defendants). Plaintiff's negligence claim fails, because he has not filed a Certificate of Merit as required by Pennsylvania Rule of Civil Procedure 1042.3(a).

The Certificate of Merit is a prerequisite to all Pennsylvania medical malpractice claims, even those brought in the federal courts through diversity or supplemental jurisdiction. See Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 265 (3d Cir. 2011) (finding that Pennsylvania's requirement of a Certificate of Merit in professional negligence claims is substantive law under the Erie doctrine and therefore must be applied by federal courts).

After previously granting Plaintiff several extensions to obtain the Certificate of Merit, the Court gave Plaintiff a final deadline of January 20, 2015, to file a Certificate of Merit or risk the dismissal of all of his medical malpractice claims. See Order dated Nov. 19, 2014, ECF No. 100. Plaintiff

27

has not filed a Certificate of Merit to date, and this lawsuit
has been pending for over three years. Accordingly, the
PrimeCare Medical Defendants' motion for summary judgment will
be granted on this issue, and Plaintiff's medical negligence
claim will be dismissed as to Defendants PrimeCare Medical,
Dillman, and Gessner.

     B.    <u>Defendants ADAPPT, Inc., and William Tillman's Motion
          for Summary Judgment (ECF Nos. 97 & 98)</u>

       The Court turns next to the summary judgment motion
filed by the ADAPPT Defendants. ECF Nos. 97, 98. The relevant
facts are as follows:

       ADAPPT is a residential facility contracted by the
DOC to provide both chemical dependency treatment and group home
services for pre-release and parole candidates. Defendant
William Tillman was the Director of ADAPPT at all relevant
times.[8]

       Plaintiff was assigned to stay at the ADAPPT facility
on two separate time periods, first from December 2005 until
some point in 2006 and later from May 17, 2007, to June 5, 2007.
Gannaway Dep. at 51:16-19, 55:6-9, 57:2-5; ADAPPT & Tillman's
Mot. Summ. J. Ex. A, Entry & Discharge Papers. Participation in

---

[8]     The ADAPPT Defendants do not describe their roles in
this case or their relationship to the DOC in their Answer or
summary judgment motion. However, in another action brought
against ADAPPT and Tillman, the Third Circuit provided the above
description for the ADAPPT Defendants. <u>Wilson v. Tillman</u>, 182 F.
App'x 126, 127 (3d Cir. 2006) (nonprecedential).

the program was a condition of his parole after serving sentences in Northampton County Prison, because he had a history of drug use. Gannaway Dep. at 65:10-16.

While Plaintiff successfully completed ADAPPT's treatment program during his first stay, Gannaway Dep. at 50:22-25, he was expelled early during his second stay for "failing to comply with the rules and policies of the ADAPPT program" and "continu[ing] to be defiant regardless of staff direction." ADAPPT & Tillman's Mot. Summ. J. Ex. A, Entry & Discharge Papers. Plaintiff acknowledges that his allegations against Defendants ADAPPT and Tillman in the instant matter entirely concern his 2007 stay at the facility. Gannaway Dep. at 54:14-18, 192:10-14.

Plaintiff's claims against ADAPPT and Tillman appear to concern three issues related to medical care:

First, Plaintiff alleges that he did not receive adequate care for an injury he obtained while at the facility. While he was opening a window in the basement of the facility, the window slammed on his hand. Gannaway Dep. at 59:2-12. Plaintiff alleges that ADAPPT personnel thought he was trying to escape and refused to let him go to the hospital or obtain medical treatment, even though he was bleeding due to a broken fingernail. Id. at 58:8-12, 61:22-62:3. Instead, the staff simply gave him Band-Aids. Id. at 59:18-19. As a result,

29

Plaintiff alleges he suffered permanent injury, specifically a "crooked" pinky finger. Id. at 61:1-2, 20-21. Plaintiff testified that he filed some sort of grievance or complaint after speaking with Defendant Tillman concerning this incident. Id. at 60:8-11.

Second, Plaintiff claims that he complained of pain stemming from the "incision" in his stomach and requested pain medication on multiple occasions during his stay at ADAPPT. Id. at 63:7-11, 64:11-15. Plaintiff alleges that he spoke with Mr. Tillman, as well as other staff, about his pain, including constipation and the development of fluid in his lungs, but they refused to help him. Id. at 65:19-23, 66:10-15. During his deposition, Plaintiff first alleged that Mr. Tillman and unspecified others refused to help him, id. at 66:3-6, although he later said they provided "a means of trying to get [a] prescription for pain medication" but Plaintiff did not have the money or insurance coverage to get it. Id. at 68:3-10. Plaintiff also later admitted that a nurse aide at the facility provided "some painkiller pills" to him, although "[t]hey didn't do much of anything." Id. at 69:18-24. He suggests that ADAPPT staff should have "call[ed] the ambulance" or sent him to a "real hospital." Id. at 69:22-24, 70:2-8.

Finally, Plaintiff alleges that ADAPPT staff did not provide him with certain medications that he was taking prior to entering the ADAPPT residence. Id. at 193:2-6.

During his deposition, Plaintiff clarified that he is bringing the same claims against ADAPPT and Tillman. Id. at 193:12-15. The Court will construe Plaintiff's claims as one for deliberate indifference to Plaintiff's medical needs pursuant to 42 U.S.C. § 1983. Since ADAPPT has a contractual relationship with the Pennsylvania Department of Corrections and Plaintiff participated in ADAPPT's program while on parole, ADAPPT and Tillman were acting under color of state law in connection with the events at issue in this case.

In their motion for summary judgment, Defendants ADAPPT and Tillman correctly point out that Plaintiff's claims against them are time-barred. Claims arising under § 1983 are subject to state statutes of limitations governing personal injury actions. Owens v. Okure, 488 U.S. 235, 249-50 (1989); Gavin v. City of Philadelphia, 354 F.3d 215, 220 (3d Cir. 2003). The applicable Pennsylvania statute of limitations for a personal injury action is two years. 42 Pa. Cons. Stat. Ann. § 5524(7). Although state law determines the duration of the limitations period, federal law determines when the cause of action accrues, thus starting the clock on the statute of limitations. Montgomery v. DeSimone, 159 F.3d 120, 126 (3d Cir.

31

1998). A § 1983 cause of action begins to accrue when the plaintiff knows, or has reason to know, of the injury on which the action is based. Id.

Here, Plaintiff's claims are barred by the statute of limitations, since Plaintiff's claims arise from his time at ADAPPT's residential facility from which Plaintiff was discharged on June 5, 2007. Plaintiff initiated the instant case in March 2012--nearly five years after his discharge from ADAPPT. In granting Plaintiff leave to file the Amended Complaint, the Court specifically explained that Plaintiff was limited to raising claims that occurred within the two-year period before March 5, 2012. See Order dated Mar. 30, 2012, at ¶ 3, ECF No. 4. The record suggests that Plaintiff was immediately aware of the alleged constitutional violations by Defendants ADAPPT and Tillman, because he testified that he made complaints and grievances about these issues during his stay at ADAPPT. Gannaway Dep. at 60:8-11, 70:16-25. In response to Defendant ADAPPT and Tillman's motion for summary judgment, Plaintiff does not address the statute of limitations, instead saying simply that "they w[]ere mostly worrying about enforcing the rehab drug program 12 steps rules as oppose[d] to[] the plaintiff['s] serious medical needs." Pl.'s Obj. ¶ 10. Accordingly, the motion for summary judgment by Defendants

ADAPPT and Tillman will be granted, and both Defendants will be dismissed from the case.

      C.    <u>Defendant Berks County Public Defender's Office's</u>
<u>Motion for Summary Judgment (ECF No. 99)</u>

      The Court next considers the motion for summary judgment filed by the Berks County Public Defender's Office ("Defender's Office"), which argues that Plaintiff failed to include any facts to support the inclusion of the Defender's Office as a defendant. ECF No. 99. In Plaintiff's Amended Complaint, the only mention of the Defender's Office is as follows:

> Defendants Nicholas Stroumbakis, Osmer Deming, and Williams Bispels under the 13th and 14th Amendment rights, [sic] violated those rights by claiming to represent petitioner to the fullest professional responsibility under his right to confront all witness. Ms. Jane Doe who[] is also a part of the Public Defender['s] Office of Berks County, also violated petitioner['s] civil rights. This violation was when Shakur C. Gannaway corresponded to them and they never responded back, about the meritable [sic] issues as well as the miscarriage of justice the petitioner received. Petitioner would like to confirm all of the correspondence, and that they were part of the corrupt[] actions against people of color with the intent on neglecting their oaths that they took to uphold their professional responsibility. They were also aware of the Petitioner's cry for medical care, but they (The Defendants) biasly [sic] ignored petitioner['s] (Shakur C. Gannaway) Cruel and Unusual punishment plea to Judge James M. Bucci.

Am. Compl. at 25. The Amended Complaint contains no additional factual allegations against the Defender's Office.

During his deposition, Plaintiff seemed to allege that his claims against the Defender's Office stem from his arrest and criminal conviction related to the 2009 armed robbery for which he is still serving his sentence. However, the Defender's Office did not represent Plaintiff during that criminal matter. Plaintiff acknowledged during his deposition that he initially applied for representation by the Public Defender's Office, but the Defender's Office withdrew early in the case due to a conflict. Gannaway Dep. at 34:10-25; Defender's Office's Mot. Summ. J. Ex. A, Glenn D. Welsh Aff. at ¶ 8. Thereafter, Plaintiff was represented by several private attorneys who are often appointed by the court to represent indigent persons that the Defender's Office is unable to represent due to a conflict or for other reasons. Id. at ¶ 7. The private attorneys who represented Plaintiff during the criminal proceedings in connection with the armed robbery and during later post-conviction relief proceedings were Nicholas Stroumbakis, Osmer Deming, and William Bispels--all of whom are named as defendants in this case. Id. The Defender's Office had no further involvement in Plaintiff's armed robbery case.

Plaintiff continues to maintain that inclusion of the Defender's Office as a defendant in this matter is proper based

34

on some relationship between the Defender's Office and court-appointed counsel. Plaintiff testified,

> I'm assuming all of them [meaning Bispels, Stroumbakis, and Deming] work for the Public Defender's Office. You're saying they have their own private practice. To me, in my eyes, they [are] still public defenders. That's how I perceived them. Any time you're appointed by the Court and I'm not paying you, the individual you represent, that's what I perceive it as. Where I'm from that's what we consider a public defender or a legal aide.

Gannaway Dep. at 37:9-19.

Plaintiff also testified that he wrote to the Defender's Office regarding the purportedly inadequate care he received while at Berks County Prison, and the Office failed to respond to his letters or take action to help him. Id. at 45:1-12.

Based on these allegations, the Court will construe Plaintiff's claims against the Defender's Office as various civil rights violations--specifically violations of his Sixth Amendment right to counsel, his Thirteenth Amendment right to be free from involuntary servitude, and his procedural due process rights under the Fourteenth Amendment--pursuant to § 1983. Plaintiff's claims against the Defender's Office fail for at least three reasons.

First, the Defender's Office and its employees are not state actors under § 1983, at least with respect to the

35

representation of criminal defendants. As stated above, a § 1983 claim has two essential elements: (1) the conduct complained of must be committed by a person acting under color of state law; and (2) this conduct must deprive the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. Kaucher, 455 F.3d at 423; Kost, 1 F.3d at 184. In Polk County v. Dodson, the Supreme Court held that a public defender's representation of an indigent criminal defendant was not under color of state law.[9] 454 U.S. 312, 318 (1981). The Supreme Court reasoned that although a public defender is employed and paid by the state, when representing a criminal defendant he acts not for the state, but rather as an adversary of the state. Id. Likewise, he does not act under color of state law, but rather pursuant to the attorney-client relationship, in which he owes undivided loyalty to his client.

---

[9]       However, "public defenders are not immune from § 1983 liability when they conspire with state officials to deprive their client of federal rights." Figueroa v. Clark, 810 F. Supp. 613, 616 (E.D. Pa. 1992) (citing Tower v. Glover, 467 U.S. 914, 920 (1984)). To make out a conspiracy claim under § 1983, the plaintiff must show that "persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999), superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727 (3d Cir. 2009). Thus, as a threshold matter, a § 1983 conspiracy claim arises only where there has been an actual deprivation of a right. Id. Nothing in Plaintiff's allegations factually supports a conspiracy claim involving the Defender's Office or its employees.

Id. Similarly, court-appointed attorneys--such as Defendants Stroumbakis, Deming, and Bispels in this case--are not state officials at all, because such attorneys "have control over their own caseloads and representations," "depend on the State only for a fee," and have "no real day-to-day involvement" with the state. Id. at 333 n.4. And finally,"[a]lthough states license lawyers to practice, and although lawyers are deemed 'officers of the court,' this is an insufficient basis for concluding that lawyers act under color of state law for the purposes of [§ 1983]." Henderson v. Fisher, 631 F.2d 1115, 1119 (3d Cir. 1980).

Second, Plaintiff has failed to proffer any evidence sufficient to raise a genuine issue of fact as to whether his court-appointed attorneys--Defendants Stroumbakis, Deming, and Bispels--were employed by the Defender's Office or whether the Defender's Office maintained any sort of policy or custom applicable to those three attorneys during the relevant time period. "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, 436 U.S. 658). In other words, a municipality may not be held liable for

constitutional torts under § 1983 on a vicarious liability theory rooted in respondeat superior, but "it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." Id. There is therefore a "two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom." Id. A "[p]olicy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (alterations in original) (quoting Pembauer v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Alternatively, "[a] course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law." Id. (alterations in original) (quoting Monell, 436 U.S. at 690). Custom may also be established "by evidence of knowledge and acquiescence." Beck, 89 F.3d at 971.

Here, Plaintiff's supposition that a public defender and a court-appointed attorney are one and the same is insufficient to show some connection between the Defender's Office and these attorneys. Further, Plaintiff has not presented any evidence as to specific deficiencies in his court-appointed attorneys' conduct, let alone a policy or custom of the Public

Defender's Office that brought about those deficiencies. And with respect to Plaintiff's claims that he reported the inadequate medical care provided at the Berks County Prison to certain employees of the Defender's Office, Plaintiff has not shown that his court-appointed attorneys or anyone at the Defender's Office is responsible for overseeing the provision of medical care at the prison.

Third, the Berks County Public Defender's Office is not a suable entity under Pennsylvania law. Under Federal Rule Civil Procedure 17(b), the capacity of an entity to be sued is determined by state law--here, Pennsylvania law. Johnson v. Montgomery Cty. Pub. Def. Office, No. 91-7615, 1992 WL 3593, at *1 (E.D. Pa. Jan. 7, 1992). The Pennsylvania Public Defender Act creates an office or position to be filled by a person for each county of Pennsylvania (with the exception of Philadelphia); it does not create a governmental entity having an existence separate from the person who fills it. 16 Pa. Cons. Stat. § 9960.3; Johnson, 1992 WL 3593, at *1. Accordingly, the Defender's Office itself lacks judicial personality and is not a suable entity. Johnson, 1992 WL 3593, at *1.

For the above reasons, the Court will grant Defendant Public Defender's Office's motion for summary judgment and will dismiss all claims against it.

39

D.   Defendant Osmer Deming's Motion for Summary Judgment
     (ECF No. 102)

Defendant Deming, Plaintiff's court-appointed attorney
in connection with his state post-conviction proceedings, also
moves for summary judgment. ECF No. 102. The facts relevant to
Plaintiff's claims against Defendant Deming are as follows:

On May 26, 2010, following a jury trial in the Court
of Common Pleas of Berks County, during which Plaintiff was
represented by court-appointed attorney Defendant Stroumbakis,
Plaintiff was found guilty of robbery, theft, receiving stolen
property, terroristic threats, conspiracy to commit robbery,
conspiracy to commit theft, conspiracy to receive stolen
property, and conspiracy to commit terroristic threats. Deming's
Mot. Summ. J. Ex. F, ECF No. 102; Gannaway Dep. at 123:14-20,
125:5-8. Plaintiff took the stand in his own defense at trial
and testified that he was a hapless bystander who did not
participate in the robbery. Id. at 127:6-14. On August 4, 2010,
Plaintiff was sentenced to a term of fifteen to thirty years'
imprisonment. Deming's Mot. Summ. J. Ex. F.

Thereafter, Plaintiff, proceeding pro se, filed a
petition under Pennsylvania's Post Conviction Relief Act
("PCRA"), 42 Pa. Cons. Stat. §§ 9541-9546, in August 2010. Id.
In October 2010, Judge Bucci of the Pennsylvania Court of Common
Pleas of Berks County appointed Defendant Deming to represent

40

Plaintiff with respect to his PCRA petition. Deming's Mot. Summ. J. Ex. A. Judge Bucci ordered Defendant Deming to file a petition detailing Defendant's eligibility for relief or a "no merit" letter requesting to withdraw from representation pursuant to Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. Ct. 1988) and Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988). Deming's Mot. Summ. J. Ex. A.

On October 7, 2013, Defendant Deming filed a seventeen-page "no merit" letter, together with a motion to withdraw as counsel, after he reviewed the record of the criminal proceedings and determined that Plaintiff's PCRA petition was meritless. Deming Mot. Summ. J. Exs. B, E. Defendant Deming also sent Plaintiff a letter advising him of his right to continue pursuing post-conviction relief pro se or with privately-retained counsel. Id. Ex. C. In November 2013, Plaintiff filed an objection to Defendant Deming's "no merit" letter. Gannaway Dep. at 131:20-23. Later, in December 2013, Plaintiff filed his own amended petition for post-conviction relief. Id. at 134:5-8. As of November 24, 2014, when Defendant Deming filed his motion for summary judgment, the Court of Common Pleas had not yet ruled on Plaintiff's PCRA petition or decided Defendant Deming's motion to withdraw. Deming's Mot. Summ. J. at 3-4; Gannaway Dep. at 128:20-129:1.

In his Amended Complaint, Plaintiff alleges that Defendant Deming, as well as his other court-appointed attorneys, violated Plaintiff's Thirteenth and Fourteenth Amendment rights "by claiming to represent petitioner to the fullest professional responsibility under his right to confront all witnesses." Am. Compl. at 20. He further alleges that "[t]his violation was when [Plaintiff] corresponded to them and they never responded back, about the meritable [sic] issues as well as the miscarriage of justice [Plaintiff] received." Id. With respect to his court-appointed attorneys, including Defendant Deming, Plaintiff also alleges that he "would like to confirm all correspondence, and that they were a part of the corrupted actions against people of color with the intent [of] neglecting their oaths that they took to uphold their professional responsibility." Id. Finally, Plaintiff contends that these attorneys "were also aware of [Plaintiff's] cry for medical care, but they ([t]he Defendants) biasly [sic] ignored [Plaintiff's] Cruel and Unusual punishment plea to Judge James M. Bucci." Id.

During his deposition, Plaintiff further explained his allegations against Defendant Deming, which appear to stem from two deficiencies.

First, Plaintiff alleges that Defendant Deming's "no merit" letter was ineffective, because he failed to include a

42

number of meritorious issues in the letter, including the following: the jury at Plaintiff's criminal trial included a woman Plaintiff knew from the community; Plaintiff's DNA was illegally obtained as the result of an earlier conviction and that DNA was planted on him in connection with the instant crime; there were various unspecified instances of prosecutorial misconduct during the trial; defense counsel failed to cross-examine a witness named Rashad Bain, who has since admitted that he committed perjury while testifying against Plaintiff; there were numerous instances of ineffective trial counsel; a certain preliminary hearing was not transcribed; an exculpatory recorded phone conversation was withheld from the jury; and a witness who would have provided testimony favorable to Plaintiff was never located. Gannaway Dep. at 129:5-131:10. During his deposition, Plaintiff acknowledged that he had the opportunity to present all of these issues to the PCRA court in his objections to Defendant Deming's "no merit" letter, as well as in his amended PCRA petition. Id. at 131:11-132:9. Still, Plaintiff continues to maintain that Mr. Deming "ignore[d] the facts involve[d] [i]n the wrongful criminal conviction" and "ha[d] the nerve to file a [F]inley/No Merit letter despite all the civil and constitutional violations." Pl.'s Obj. ¶ 13. As a result, Plaintiff has "been incarcerated nearly 6 and [a] half years on this wrongful conviction." Id.

43

Second, Plaintiff testified that he "constantly" wrote to Defendant Deming during the course of their attorney-client relationship and received only four or five letters from Mr. Deming in response. Id. at 133:6-25. In his letters, Plaintiff purportedly disclosed information to Defendant Deming concerning the "inhuman[e] treatment" he received while in prison, and Defendant Deming did nothing. Pl.'s Obj. ¶ 11.

Based on the Complaint and Plaintiff's deposition testimony, the Court will construe Plaintiff's claims against Defendant Deming as (1) violations of the Thirteenth and Fourteenth Amendments to the United States Constitution pursuant to § 1983 and (2) a Pennsylvania state law legal malpractice claim.

### 1.   Section 1983 Claim Against Defendant Deming

With respect to Plaintiff's § 1983 claim against Defendant Deming, as explained more fully above, criminal defense attorneys, including public defenders and those appointed by the court, do not act "under color of state law" and are not liable under § 1983 when performing traditional functions as defense counsel. Polk County, 454 U.S. at 321, 324. Although a court-appointed attorney could be subject to § 1983 liability if he conspired with state officials to deprive his client of federal rights, see Figueroa, 810 F. Supp. at 616,

44

Plaintiff has not alleged facts supporting such a conspiracy
here. He merely says that "all court appointed attorneys
insi[s]t upon allowing corruption [to] remain unresolve[d]" and
"condon[ed] the acts of the Berks County court officials of
Reading projecting Jim Crow acts." Pl.'s Obj. ¶¶ 12, 13. Such
vague statements do not raise a genuine issue as to whether
Defendant Deming conspired with state actors to violate
Plaintiff's constitutional rights. Thus, as a matter of law,
Plaintiff's § 1983 claim against Defendant Deming must be
dismissed.

Moreover, to the extent Plaintiff's claims against
Defendant Deming concern Plaintiff's belief that his criminal
conviction should be overturned, a § 1983 action is not the
proper vehicle. In Heck v. Humphrey, the Supreme Court held that
a state prisoner could not maintain an action for damages under
the civil rights laws if "a judgment in favor of the plaintiff
would necessarily imply the invalidity of his conviction or
sentence . . . unless the plaintiff can demonstrate that the
conviction or sentence has already been invalidated." 512 U.S.
477, 487 (1994). In Edwards v. Balisok, the Supreme Court
extended this principle and found a claim for declaratory relief
not cognizable under § 1983 because it would "necessarily imply
the invalidity of the punishment imposed." 520 U.S. 641, 648
(1997). More recently, the Supreme Court announced that a "state

45

prisoner's § 1983 action is barred (absent prior invalidation)--
no matter the relief sought (damages or equitable relief), no
matter the target of the prisoner's suit (state conduct leading
to conviction or internal prison proceedings)--if success in
that action would necessarily demonstrate the invalidity of
confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74,
81-82 (2005).

### 2.  Legal Malpractice Claim Against Defendant Deming

If the Court were to construe Plaintiff's claim
against Defendant Deming as a state-law legal malpractice claim,
it too would fail. As a threshold matter, a plaintiff bringing a
professional liability claim against an attorney under
Pennsylvania law is required to file a Certificate of Merit,
indicating that the "appropriate licensed professional"--here,
an attorney--"has supplied a written statement that there exists
a reasonable probability that the care, skill or knowledge
exercised or exhibited in the . . . work that is the subject of
the complaint, fell outside acceptable professional standards
and that such conduct was a cause in bringing about the harm."
Pa. R. Civ. P. 1042.1, 1042.3. Plaintiff has filed no such
Certificate of Merit in this case.

Moreover, Plaintiff has not made out a legal
malpractice claim. Under Pennsylvania law, the elements of a

legal malpractice claim vary based on whether the underlying
representation was civil or criminal. Bailey v. Tucker, 621 A.2d
108, 112 (Pa. 1993). While the Pennsylvania Supreme Court has
not addressed the issue, at least one Pennsylvania intermediate-
level appellate court has applied the elements of a legal
malpractice action arising out of a criminal matter to a legal
malpractice action arising out of a PCRA matter. Slaughter v.
Rushing, 683 A.2d 1234, 1234-36 (Pa. Super. Ct. 1996); see also
Williams v. Strum, 110 F. Supp. 2d 353, 358-59 (E.D. Pa. 2000)
(reviewing Slaughter and explaining the rationale for extending
the legal malpractice standard for criminal matters to habeas
corpus petitions).

A plaintiff seeking to bring a professional
malpractice claims against an attorney resulting from the
representation of the plaintiff in criminal proceedings must
establish the following elements:

(1) The employment of the attorney;

(2) Reckless or wanton disregard of the defendant's
interest on the part of the attorney;

(3) The attorney's culpable conduct was the proximate
cause of an injury suffered by the defendant/
plaintiff, i.e. "but for" the attorney's conduct,
the defendant/plaintiff would have obtained an
acquittal or complete dismissal of the charges;

(4) As the result of the injury, the criminal
defendant/plaintiff suffered damages; and

(5) Moreover, a plaintiff will not prevail in an
action in criminal malpractice unless and until

47

> her has pursued post-trial remedies and obtained
> relief which was dependent upon attorney error[.]

Slaughter, 683 A.2d 1234, 1235-36 (quoting Bailey, 621 A.2d at

115). To establish the requisite causation for a legal

malpractice claim, "a plaintiff must prove . . . that he did not

commit any unlawful acts with which he was charged as well as

any lesser offenses included therein." Bailey, 621 A.2d at 113.

Where a plaintiff fails to show that he is innocent of all the

charges against him, he has not stated a cause of action for

legal malpractice in the criminal context under Pennsylvania

law. Slaughter, 683 A.2d at 1236.

Here, Plaintiff has not shown that he is innocent of

all charges against him. He lists a number of issues that he

believes Defendant Deming should have raised in a PCRA petition,

but he does not establish that "but for" Defendant Deming's

failure to raise these issues, Plaintiff would have obtained any

relief pursuant to the PCRA, much less a complete dismissal of

all criminal charges. In addition, Plaintiff has not shown that

he has exhausted possible remedies under the PCRA, much less

that he obtained relief based on one of the grounds that

Defendant Deming failed to raise in a PCRA petition or concluded

had no merit in his "no merit" letter. Indeed, when Plaintiff

filed the Amended Complaint in this matter through the time when

Plaintiff's deposition was taken in June 2014, the PCRA court had not yet ruled on Plaintiff's PCRA petition.[10]

     For these reasons, summary judgment will be granted in Defendant Deming's favor as to the legal malpractice claim as well.

    E.   <u>Commonwealth Defendants' Motion for Summary Judgment (ECF Nos. 113 & 114)</u>

     Lastly, the Court turns to the Commonwealth Defendants' motion for summary judgment. ECF Nos. 113 & 114. In this case, Plaintiff brings claims against fifty-four Commonwealth of Pennsylvania employees. Thirty-three Commonwealth employees join in the motion for summary judgement.[11]

---

[10]    Neither Plaintiff nor Defendant Deming has provided the Court with an update as to the disposition of the PCRA pleadings in the state court. Interestingly, at the time that Plaintiff initiated this action against Defendant Deming--as well as when Defendant Deming, representing himself, deposed Plaintiff in this case--Defendant Deming was still counsel of record for Plaintiff in the PCRA proceedings, because the state court had not yet ruled on his motion to withdraw.

[11]    The following Commonwealth employees named as defendants in this action join in the Commonwealth Defendants' motion for summary judgment: (1) Tonya Heist (misnamed "Tonya Hiet" in the Amended Complaint); (2) Paul Leggore, (3) Jeffrey Witherite, (4) Edwin Shoop, (5) Emil Notarfrancesco (misnamed "Notafrifrancesco" in the Amended Complaint), (6) Kenneth Klaus, (7) Robert Gimble, (8) John Horner, (9) Dan Davis, (10) David Ferrier, (11) Kerri Moore, (12) Michael Guyton, (13) Tracy Shawley, (14) John McAnany, (15) Michael Bell, (16) Erika Foose, (17) Elaine Coffman, (18) Francis Dougherty, (19) Barry Johnson, (20) Kuhn Hex, (21) John McHenry, (22) Barry Detwiler, (23) James Morris, (24) Marirosa Lamas, (25) Kevin Butler, (26)

Plaintiff's claims against the various Commonwealth Defendants in this case concern his current period of incarceration with the DOC beginning in September 2010. Commonwealth Defs.' Statement of Undisputed Facts at ¶¶ 11-12, ECF No. 114. While serving his current sentence, Plaintiff has been transferred between several different state correctional institutions. Id. at ¶ 12.

Plaintiff's allegations related to the Commonwealth Defendants, together with the relevant facts and organized by state correctional institution, are as follows:

### SCI-Camp Hill

Plaintiff was incarcerated at SCI-Camp Hill from September 15, 2010, to November 8, 2010. Commonwealth Defs.' Mot. Summ. J. Ex. B. While at SCI-Camp Hill, Plaintiff alleges that he was subjected to the following constitutional

---

Christopher Lachat (misnamed "Sgt. Loquat" in the Amended Complaint), (27) Jeremy Luzier, (28) Lynne Eaton, (29) Diana Beatty, (30) Jeffrey Rackovan, (31) Alan Riggall, (32) Tejeda Fernando, and (33) James Sutton.

The following individuals named in the Amended Complaint are alleged to be Commonwealth employees or agencies but were never served and therefore have not joined in the summary judgment motion filed by the Commonwealth Employees: (1) Doris Weaver, (2) Lizhong, (3) Teresa Law, (4) Gail Kelly, (5) John Palakovich, (6) Jeffrey Ditty, (7) Richard Southers, (8) Emil Michael Kazor, (9) "(PHS Correctional Healthcare) Most of State Prison," (10) Ted W. Williams, (11) Sgt. Vargas, (12) Horton, (13) "Deputy," (14) Marsh (Deputy Warden), (15) "c/o Moore," (16) "c/o Weaver," (17) Lt. Fox, and (18) Kitchen Worker Luss.

violations: inadequate medical treatment, including failure to remove an internal stitch in his stomach and denial of certain medication; denial of access to the law library; incorrect charges for an overdue library book without due process; and transfer to SCI-Greene in retaliation for filing grievances. Gannaway Dep. at 142:13-147:1, 164:2-16.

With respect to his medical treatment, Plaintiff alleges that he suffered severe pain in his side as a result of the "internal stitch" left in his abdomen. Id. at 114:1-17, 118:16-119:10. However, Plaintiff never complained about the stitch while incarcerated at SCI-Camp Hill. Upon transfer to SCI-Camp Hill, Plaintiff underwent a medical screening, during which he complained of back pain and bloody stool but did not complain of abdominal pain. Commonwealth Defs.' Mot. Summ. J. Ex. C-2, at 50. While at SCI-Camp Hill, Plaintiff had multiple medical visits, id. at Ex. C-3, at 22-26, and received various prescriptions to treat high blood pressure, constipation, acid reflux, and pain, id. at 32-70. Medical records from SCI-Camp Hill show that Plaintiff did not complain about the internal stitch during medical visits. Id. at 22-26. In addition, Plaintiff filed no grievances complaining of inadequate medical treatment or failure to remove the internal stitch. See generally Commonwealth Defs.' Mot. Summ. J. Exs. D-1 to D-7.

Plaintiff also alleges that he was denied access to the law library while at SCI-Camp Hill. Gannaway Dep. at 144:7-20. As a result, he alleges that was unable to submit timely and meaningful responses to the court, and the excessive force lawsuit he was pursuing at the time was dismissed. Id. Plaintiff claims that a "range of people" were involved in denying him access to the law library and that he could not remember specific actions taken by any of the Commonwealth Defendants employed at SCI-Camp Hill. Id. at 163:7-20.

Plaintiff presumably refers to a civil rights suit he brought in the Eastern District of Pennsylvania in 2009 against the Borough of Reading, its police officers, and a hospital, among others, alleging constitutional violations arising from his being tackled on the street prior to his arrest and his treatment as a pretrial detainee, Gannaway v. Karetas, No. 09-2688. Commonwealth Defs.' Mot. Summ. J. Ex. E. The defendants in that matter filed a motion for summary judgment in August 2010. Id. at 10. Plaintiff was initially given three months to respond to the motion and was later granted an extension of two additional months to respond. Id. at 11. Plaintiff then filed a response to the motion, and summary judgment was ultimately entered in favor of the defendants on all claims. See generally Gannaway v. Karetas, No. 09-2688, 2011 WL 1196872 (E.D. Pa. Mar. 31, 2011) (Robreno, J.). Plaintiff appealed to the Third Circuit

Court of Appeals, which found no substantial issue on appeal and affirmed the district court's judgment. Gannaway v. Karetas, 438 F. App'x 61, 68 (3d Cir. 2011) (nonprecedential).

During his time at SCI-Camp Hill, Plaintiff filed only one grievance, No. 342419, which concerned denial of access to the law library. Commonwealth Defs.' Mot. Summ. J. Ex. D, pt. 7 at 28-29, ECF No. 114-12. The grievance was denied, because law library records showed regular visits by Plaintiff. Id. at 28. Plaintiff did not further appeal this grievance. Id.

Next, Plaintiff alleges that his due process rights were violated by SCI-Camp Hill personnel when he was improperly charged a fine for failing to return a library book that certain correctional officers would not permit him to return on the day of his transfer to SCI-Greene, but he does identify specific defendants who were involved. Gannaway Dep. at 164:20-166:17; Am. Compl. ¶¶ 14, 28. Plaintiff also wavers on the amount of the charges, first alleging $47, Am. Comp. ¶ 14, then $37, id. ¶ 28, and finally $70 to $80, Gannaway Dep. at 165:1-3. Plaintiff did not file a grievance disputing the book charges. See generally Commonwealth Defs.' Mot. Summ. J. Ex. D.

Finally, with respect to his time at SCI-Camp Hill, Plaintiff alleges that he was transferred from SCI-Camp Hill to SCI-Greene in retaliation for filing grievances. Gannaway Dep. at 144:24-145:2. However, Plaintiff filed only one grievance,

which was dated October 27, 2010, while incarcerated at SCI-Camp Hill. Commonwealth Defs.' Mot. Summ. J. Ex. D, pt. 7 at 29, ECF No. 114-12. The decision to initiate Plaintiff's transfer to SCI-Greene was made on October 25, 2010--two days before Plaintiff filed the grievance. Commonwealth Defs.' Mot. Summ. J. Ex. F, Debora Alvord Decl. ¶ 4. During his deposition, Plaintiff conceded that he was repeatedly told that SCI-Camp Hill was not his "home jail" and that his incarceration there was temporary. See, e.g., Gannaway Dep. at 110:3-5, 113:21-22, 148:11-14.

SCI-Greene

On November 8, 2010, Plaintiff was transferred to SCI-Greene, where he remained incarcerated until April 29, 2011. Commonwealth Defs.' Mot. Summ. J. Ex. B. During his time at SCI-Greene, Plaintiff alleges that he was subjected to the following constitutional violations: inadequate medical treatment, namely the failure to remove the internal stitch and provide certain medication; denial of access to the courts; and transfer in retaliation for filing grievances. Gannaway Dep. at 168:3-170:1.

With respect to medical treatment, Plaintiff had a medical screening immediately upon transfer to SCI-Greene, at which time he complained of lower back pain, high blood pressure, acid reflux, constipation, and hemorrhoids, but not abdominal pain. Commonwealth Defs.' Mot. Summ. J. Ex. C-2, at 48-49. Throughout his time at SCI-Greene, Plaintiff received

54

prescriptions for high blood pressure, constipation, acid reflux, and pain. Id. Ex. C-3, at 32-70; Gannaway Dep. at 170:12-22, 172:6-10. Plaintiff had a number of medical visits while at SCI-Greene, during which he never complained of abdominal pain. Commonwealth Defs.' Mot. Summ. J. Ex. C-3, at 17-20. He submitted four grievances related to medical treatment, but none mentioned the internal stitch. See generally Commonwealth Defs.' Mot. Summ. J. Ex. D.

Plaintiff also filed several grievances about being charged for medication, all of which were denied because the charges were made in accordance with DOC policy. Mot. Summ. J. Exs. D-7, at 10-29, Grievance No. 347042; D-7, at 5-9, Grievance No. 348752; D-6, at 57-60, & D-7, at 19-21, Grievance No. 353111; Ex. F, DOC Policy DC-ADM 820, Co-Payment for Medical Services. Plaintiff did not complete the final appeal process for any of these grievances. See id. Exs. D-7, at 10-29, Grievance No. 347042; D-7, at 5-9, Grievance No. 348752; D-6, at 57-60, & D-7, at 19-21, Grievance No. 353111.

Plaintiff next alleges that he was denied access to the courts while incarcerated at SCI-Greene. At the time, Plaintiff had three lawsuits pending in the Eastern District of Pennsylvania: Gannaway v. Berks County Prison, No. 09-4501; Garcia v. Berks County Prison, No. 10-0240; and Gannaway v.

Marsh, No. 11-4748. Commonwealth Defs.' Mot. Summ. J. Exs. H-J.[12]
The dockets from these lawsuits suggest that the courts granted
Plaintiff extensions of time when requested, and Plaintiff did
not fail to make any necessary filing during his time at SCI-
Greene. Id.

While at SCI-Greene, Plaintiff filed three grievances
that his legal mail was opened or "cut-up with a razor" and
access to the law library was denied. Commonwealth Defs.' Mot.
Summ. J. Exs. D-6, at 45-46, Grievance No. 362082; D-6, at 43-
44, Grievance No. 362621; D-6, at 38-39, Grievance No. 362623.
These grievances were denied for two reasons. First, the mail at
issue did not meet the requirements for privileged legal mail
under DOC Policy DC-ADM 803, as they were directed to the Inmate
Accounting Department, and Plaintiff's mail was otherwise
processed in accordance with that policy. Id. D-6, at 43.
Second, Plaintiff was given access to the law library but was
denied extra library time outside of regular hours because he
did not have pending court deadlines, as required by DOC policy.

---

[12]      The Commonwealth Defendants' Exhibits H and I are both
the docket reports for Gannaway v. Berks County Prison, No. 09-
4501, and the Commonwealth Defendants do not include the docket
report for Garcia v. Berks County Prison, No. 10-0240, as an
exhibit to their summary judgment motion. However, the docket
report for the latter case is available through Public Access to
Court Electronic Records (PACER), the federal courts' electronic
public access service.

Id. at 36. Plaintiff did not further appeal any of these grievances.

In total, Plaintiff filed thirteen grievances while at SCI-Greene, the earliest dated November 13, 2010, and the latest dated April 22, 2011. Id. Exs. D-6, at 39-60; D-7, at 1-27. After Plaintiff's transfer to SCI-Rockview, he filed one additional grievance regarding the time he was incarcerated at SCI-Greene. Id. Ex. D-6, at 33-35.

### SCI-Rockview

Plaintiff was transferred to SCI-Rockview on April 29, 2011, and remains there to date. Id. Ex. B. Plaintiff alleges he was subjected to the following constitutional violations at SCI-Rockview: inadequate medical treatment, namely failure to remove the internal stitch and provide certain medication; denial of access to the courts; fabricated disciplinary charges in violation of due process; destruction of his property without due process; and disciplinary charges in retaliation for filing grievances. Am. Compl. ¶¶ 7-8, 19-20, 24, 32-33, pp. 15, 19, 26.

Plaintiff's medical care at SCI-Rockview includes frequent medical visits; medication for high blood pressure, constipation, pain, and acid reflux; and diagnostic testing, including x-rays, sonograms, and echocardiograms. Gannaway Dep. at 116:1-118:4, 175:9-176:19; see generally Commonwealth Defs.' Mot. Summ. J. Exs. C-1; C-2, at 1-47; C-3.

Plaintiff alleges that he was diagnosed with the "internal stitch" for the first time while at Rockview. Pl.'s Obj. ¶ 2. The earliest mention in Plaintiff's medical records of Plaintiff's complaints about the internal stitch is a physician assistant's notation on November 21, 2011, that Plaintiff requested to have an "internal suture" removed. Commonwealth Defs.' Mot. Summ. J. Ex. C-3, at 8. Plaintiff then had a follow-up visit with John Symons, M.D. on December 5, 2011, during which Dr. Symons examined Plaintiff and noted that Plaintiff may have internal scarring--from the earlier stabbing incident--that might cause pain, but that no surgery was need. Id. at 9. Dr. Symons ordered medication to address Plaintiff's pain and constipation, recommended a follow-up visit, and revised Plaintiff's medical clearances and restrictions. Id. Ex. C-2, at 25. Plaintiff had another visit with Dr. Symons on March 29, 2012, during which he again complained of abdominal pain and requested surgery to remove the stitch. Id. Dr. Symons again examined Plaintiff and determined there was no "obstructive problem" warranting surgery, but referred Plaintiff for two outside medical consultations to further investigate Plaintiff's complaints. An abdominal ultrasound and an upper gastrointestinal and small bowel x-ray series were conducted in April and May of 2012, and neither test returned abnormal results. Id. Ex. C-1, at 34-37.

Plaintiff had another sick visit on August 28, 2012, during which he again requested surgery for the internal stitch. Id. Ex. C-2, at 18. The examining doctor, Christina Doll, M.D., explained to Plaintiff that no surgery was planned. Id. Plaintiff later filed a grievance on November 4, 2011, complaining that the surgery to remove the internal stitch had been delayed for two years. Commonwealth Defs.' Mot. Summ. J. Ex. D-5, at 54, Grievance No. 388149. The responding officer reported that after a review of Plaintiff's medical records, he could "find no record of an internal suture that required removal." Id. at 53. Plaintiff did not appeal this grievance.

On February 22, 2013, Plaintiff visited the nursing station, complaining that his medications had not been renewed. Commonwealth Defs.' Mot. Summ. J. Ex. C-2, at 10. During this visit, a nurse explained to Plaintiff that his medication was not renewed because he had missed two scheduled sick visits and that he was required to follow-up with a sick call visit to a doctor to have his prescriptions renewed. Id.

Throughout his incarceration at SCI-Rockview, Plaintiff filed several grievances complaining about copayment charges for his medical visits and medications. See, e.g., Commonwealth Defs.' Mot. Summ. J. Exs. D-1, at 18-19, Grievance No. 526174; D-1, at 55-59, Grievance No. 517119. In response, Plaintiff was repeatedly informed that he was appropriately

charged for medications and doctor's visits pursuant to DOC policies. E.g., Commonwealth Defs.' Mot. Summ. J. Exs. D-1, at 18, Grievance No. 526174; D-1, at 55, Grievance No. 517119.

Plaintiff also alleges that Defendants Dougherty and Riggall, correctional officers at SCI-Rockview, denied him access to the courts, namely that they denied him access to the law library, paralegal assistance, and free postage and copies for legal documents. Am. Compl. ¶ 14, pp. 18-19, 26. Library records, however, show that Plaintiff regularly visited the law library, although there were times he was denied extra time because he did not have a pending court deadline, as required for additional time pursuant to DOC policy. Commonwealth Defs.' Mot. Summ. J. Exs. D-6, at 36, Grievance No. 364705; D-1, at 26, Grievance No. 522695. In addition, DOC Policy DC-ADM-007, Access to Provided Legal Service, provides that paralegal assistance is available to only illiterate or non-English-speaking inmates. Id. at Exs. D-6, at 2, Grievance No. 385621; D-5, at 55, Grievance No. 387788. Finally, records show that on several occasions, Plaintiff was granted a package of free postage, envelopes, and copying credits based on his indigent status. Id. Exs. D-5, at 46, Grievance No. 396358; D-4, at 44, Grievance No. 431312; D-2, at 16, Grievance No. 510958; D-2, at 4, Grievance No. 514722.

Next, Plaintiff alleges that correctional officers Defendants McHenry and Detwiler violated his due process rights by fabricating misconduct charges against him and that Defendant Hex, the hearing examiner, also violated his due process rights by finding him guilty of the charges. Am. Compl. ¶ 36 & p. 19. During the time period at issue in this case, four misconduct charges were sustained against Plaintiff after evidentiary hearings. Commonwealth Defs.' Mot. Summ. J. Ex. K at 1, DOC Misconducts R. (listing misconduct incidents involving Plaintiff on August 22, 2011; June 23, 2012; July 16, 2012; and March 19, 2014). Plaintiff was sanctioned to thirty to ninety days in the restricted housing unit ("RHU") for each offense. Id. Plaintiff appealed three of the misconduct charges, and the hearing examiner's decision was upheld each time. Id.

Plaintiff also alleges that Defendants McHenry, Detwiler, and Sutton violated his due process rights by taking and destroying his property. Am. Comp. ¶ 24; ECF No. 62, at 4. Several grievances appear to be relevant to this claim. First, Plaintiff filed a grievance complaining that Defendants McHenry and Detwiler wrongly confiscated Plaintiff's art supplies during a cell search on August 22, 2011. Commonwealth Defs.' Mot. Summ. J. Ex. D-6, at 13, Grievance No. 378425. This grievance was denied as unfounded because Plaintiff did not have a valid art permit, meaning the art supplies were confiscated as contraband.

61

Id. at 12. Plaintiff did not pursue further administrative appeal of this grievance. Id.

Second, Plaintiff filed a grievance complaining that Defendant McHenry destroyed his property, including food items, a book, and thermal underwear, when Plaintiff was sent to the RHU. Id. Ex. D-5, at 13, Grievance No. 421116. This grievance was denied after an investigation showed that upon entering the RHU, Plaintiff had signed a property inventory sheet that did not list any of the items that Plaintiff claimed Defendant McHenry destroyed, and Plaintiff had signed another inventory sheet upon leaving the RHU that did not note any missing property. Id. This grievance was upheld upon appeal to the facility manager, and Plaintiff did not pursue final administrative appeal of this decision. Id. at 8.

Third, and finally, Plaintiff filed a grievance complaining that Defendant McHenry destroyed his property when he was sent to the RHU, and that Defendant Sutton condoned these actions. Id. at 53, Grievance No. 504672. The grievance was denied as unfounded after an investigation showed that most of the items Plaintiff claimed were destroyed were listed on Plaintiff's property inventory sheet or on a confiscation receipt having been identified as contraband, and there was no evidence that Plaintiff ever possessed the remaining items. Id. at 52. This grievance was upheld upon appeal to the facility

62

manager, and Plaintiff did not pursue final appeal of this decision. Id. at 49.

Based on Plaintiff's liberally construed allegations and the above facts, the Court will construe Plaintiff's claims against the Commonwealth Defendants as the following: (1) deliberate indifference to Plaintiff's medical conditions in violation of the Eighth Amendment; (2) violation of Plaintiff's due process rights; (3) denial of access to the courts; and (4) retaliation in violation of the First Amendment.

Prior to discussing the merits of Plaintiff's constitutional claims against the Commonwealth Defendants, the Court notes that Plaintiff appears to have failed to exhaust the DOC's administrative remedy process for the vast majority, if not all, of his claims against the Commonwealth Defendants, as required by the PLRA. 42 U.S.C. § 1997(e). Therefore, the claims against the Commonwealth Defendants are not properly before the Court.[13] However, for the sake of completeness--and because it is difficult to discern the lengthy, rambling, handwritten grievances that Plaintiff has provided to the Court--the Court will review these claims on the merits as if exhausted. See 42

---

[13]     As noted above, transfer to another prison facility does not excuse a prisoner from complying with the PLRA's exhaustion requirement. In re Bayside Prison Litig., 2008 WL 2387324, at *4. Therefore, Plaintiff was still required to exhaust those claims concerning happenings at SCI-Camp Hill and SCI-Greene, even after his transfer out of those facilities.

U.S.C. § 1997e(c)(2) ("In the event that a claim is, on its face, frivolous, malicious, [or] fails to state a claim upon which relief can be granted . . . the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.").

1. <u>Eighth Amendment Claim Against All Commonwealth Defendants</u>

In his Amended Complaint, Plaintiff alleges that the Commonwealth Defendants violated the Eighth Amendment by failing to remove the "internal stitch," which was purportedly left in his abdomen from a surgery he received prior to his DOC custody and has caused him continued pain and difficulty moving his bowels. Am. Compl. ¶ 6; Gannaway Dep. at 114:1-17, 118:18-119:10. Plaintiff claims that all of more than fifty individual Commonwealth Defendants listed are liable for violating the Eighth Amendment, but he has not presented facts showing how each defendant was personally involved in the allegedly inadequate medical care. At his deposition, Plaintiff could not recall what each specific Commonwealth defendant had done to violate his constitutional rights, instead stating that he named each person listed in the Amended Complaint because he or she was in a "supervisory or authoritative position," Gannaway Dep. at 153:5-154:9, had "some control or [was] in control" somehow, <u>id.</u> at 165:19-23, or otherwise was "part of that one corrupted

body," id. at 158:2-3. In his opposition to Defendants' motions for summary judgment, Plaintiff continues to maintain that "all defendants ignor[ed] the medical records to[] remove the incision." Pl.'s Obj. ¶ 2.

To impose liability on individual defendants under § 1983, a plaintiff must show that each one personally participated in the alleged constitutional violation or approved of it. C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (finding that in a § 1983 suit, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct"). Liability "cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Personal involvement can be shown through proof of personal direction or actual knowledge and acquiescence. Evancho, 423 F.3d at 353 (citing Rode, 845 F.2d at 1207). Acquiescence requires both contemporaneous knowledge of the alleged wrongdoing and direct supervisory authority over the subordinate actor. Rode, 845 F.2d at 1207-08.

Plaintiff has not articulated any facts concerning the role that each Commonwealth defendant played in his defective medical treatment, specifically the failure to remove the internal stitch. Plaintiff merely states that all of the

65

Commonwealth Defendants were "generally responsible for ensuring the provision of medical care to [p]risoners," Am. Compl. ¶ 6, and "deliberately just ignore[d] it," meaning the stitch, Gannaway Dep. at 157:8-158:6, or that all of these defendants "condone[d] the medical department[']s negligence," Am. Compl. ¶ 8. At his deposition, Plaintiff was asked to describe what role each defendant played in the Eighth Amendment violations, but he was unable to recall any individual's role.[14] See, e.g., Gannaway Dep. at 153:1-154:9, 156:15-22, 157:5-15. Moreover, only two of the Commonwealth defendants, nurses Elaine Coffman and Erica Foose, had direct involvement in providing medical care to Plaintiff. Commonwealth Defs.' Statement of Undisputed Facts ¶ 4, ECF No. 114. The remaining defendants "span prison personnel as diverse as superintendents and corrections officers to mailroom supervisor and school principal." Id. Accordingly, Plaintiff has not shown the personal involvement of each

---

[14]     During his deposition, Plaintiff repeatedly referred to a summary judgment motion that he filed on April 21, 2014 (ECF No. 62), which he claimed contained additional detail about the role of each of the Commonwealth Defendants. Review of this motion reveals that it contains no facts as to how each individual defendant violated his Eighth Amendment rights and refers only generically to the defendants. Plaintiff attaches five grievances as exhibits to his motion, but only one appears to be relevant to the allegations in the instant lawsuit. That grievance concerns the alleged destruction of Plaintiff's property by Defendants McHenry, Detwiler, and Sutton and has nothing to do with Plaintiff's medical care. ECF No. 62, at 4.

defendant in the violation of his Eighth Amendment rights
required to bring a § 1983 claim.

Even if the Court were to construe Plaintiff's Eighth
Amendment claims as confined to those Commonwealth employees who
denied his grievances concerning medical treatment and Plaintiff
could establish that the denials were inappropriate, denial of a
grievance does not rise to the level of personal involvement
required for § 1983 liability. See Brooks v. Bearn, 167 F. App'x
923, 925 (3d Cir. 2006) (nonprecedential) (finding that
allegations that the defendants responded inappropriately to the
plaintiff's grievances about his medical treatment did not
establish the defendants' involvement in the medical treatment
itself for an Eighth Amendment claim); Kuehner v. Beard, No. 08-
1319, 2010 WL 49455, at *5 (W.D. Pa. Jan. 6, 2010) (finding that
"the filing of a grievance is not sufficient to show the actual
knowledge necessary for personal involvement").

In addition, Plaintiff fails to set forth facts
showing that the Commonwealth Defendants "were deliberately
indifferent to his serious medical needs," as required to make
out an Eighth Amendment claim based on inadequate medical care.
The Court set out the standard for evaluating such a claim above
in connection with its discussion of the medical care provided
by the PrimeCare Medical Defendants and incorporates the
standard here. See subsection IV.A.1.

67

Plaintiff conceded during his deposition that he received extensive medical treatment while in DOC custody, including regular medical visits; prescriptions for medication to treat pain, acid reflux, high blood pressure, and constipation; and various diagnostic testing, including x-rays and sonograms. With regard to the internal stitch that appears to be the crux of Plaintiff's medical claims, Plaintiff made no complaints about the stitch while he was in custody at SCI-Camp Hill or SCI-Greene. Indeed, Plaintiff admitted during his deposition that he did not learn that the internal stitch required removal until around November 2011--six months after his transfer to SCI-Rockview. Gannaway Dep. at 75:12-23; Pl.'s Obj. ¶ 2.

The medical records show that Plaintiff first complained about the stitch on November 21, 2011, and Rockview medical staff took prompt steps to investigate his complaint. Commonwealth Defs.' Mot. Summ. J. Ex. C-3, at 8. For example, on December 5, 2011, Dr. Symons examined Plaintiff, and noted that Plaintiff's medical history involved two prior stabbings in the abdomen, and after the last stabbing, Plaintiff developed a draining sinus secondary to a stitch granuloma, which had previously been removed. Id. Ex. C-3, at 9. Dr. Symons also noted that Plaintiff had a small ventral hernia that was not distended and concluded that Plaintiff's prior stabbing injury

may have resulted in internal scarring that might cause pain.
Id. However, he concluded that no further surgery was warranted
at the time, although he did prescribe medications for pain and
constipation. Id.

Plaintiff then had a follow-up visit regarding the
hernia with Dr. Symons on March 29, 2012. Id. Ex. C-2, at 24.
Again, Plaintiff requested surgery, and in response, Dr. Symons
explained that Plaintiff had already undergone the granuloma
surgery and that his current condition did not warrant
additional surgery. Id. Dr. Symons also examined Plaintiff and
concluded that there were no changes to his abdomen, the wound
from the granuloma surgery was well healed, the ventral hernia
showed no protruding viscera, and although there may be internal
scarring causing Plaintiff pain, no surgery was warranted
because there were no signs of an obstructive problem. Id. at
25. Dr. Symons also referred Plaintiff for an abdominal
ultrasound and upper gastrointestinal and small bowel x-ray
series, which showed no abnormalities. Id. at 25, 33-37.
Plaintiff made the same complaint again in August 28, 2012--this
time to a different doctor, who again advised Plaintiff that no
surgery was planned. Id. Ex. C-2, at 18.

Plaintiff wholly dismisses the comprehensive medical
treatment he has received. He contends that he should have
received surgery to remove the "internal stitch," but where an

inmate simply disagrees with the course of treatment provided to

him, courts have consistently precluded the provider's

liability. Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 346;

see also Innis v. Wilson, No. 07-1343, 2008 WL 4722404, at *3

(W.D. Pa. Oct. 24, 2008). Even if some medical professionals

would disagree as to the appropriate treatment for Plaintiff's

condition,[15] the treatment selected by DOC medical providers

would not rise to the level of deliberate indifference. White v.

Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's

disagreement with a doctor's professional judgment does not

state a violation of the Eighth Amendment, then certainly no

claim is stated when a doctor disagrees with the professional

judgment of another doctor. There may, for example, be several

acceptable ways to treat an illness.").

Moreover, all of the Commonwealth Defendants--with the

exception of Defendants Erica Foose and Elaine Coffman, who are

nurses--are non-medical personnel, so they were justified in

believing Plaintiff's medical care was adequate. Commonwealth

Defs.' Mot. Summ. J. at 14. The Third Circuit has held that

---

[15]    During his deposition, Plaintiff seemed to suggest
that Dr. Fisher at SCI-Rockview told him that the internal
stitch required surgical removal. Gannaway Dep. at 75:12-23.
Also, in his opposition to the summary judgment motions,
Plaintiff seems to claim the surgery was ordered by some doctor
at some point in time. Pl.'s Obj. ¶ 2. However, Plaintiff's DOC
medical records show no recommendation for surgery. Commonwealth
Defs.' Mot. Summ. J. Ex. C.

"[i]f a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gills, 372 F.3d 218, 236 (3d Cir. 2004). Therefore, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id.; see also Farmer, 511 U.S. at 837 (holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety" and is "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists[] and . . . also draw[s] the inference").

Accordingly, without more, Plaintiff's allegations that the Commonwealth Defendants denied or ignored his medical grievances do not establish deliberate indifference under the Eighth Amendment standard. See, e.g., Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (finding that a non-physician prison official cannot be considered deliberately indifferent in failing to respond to medical complaints of a prisoner already under treatment by the prison's medical experts); Burnside v. Moser, 138 F. App'x 414, 416 (3d Cir. 2005) (nonprecedential)

(finding that a non-physician prison official's failure to process a prisoner's medical grievances failed to demonstrate the requisite level of deliberate indifference).

To the extent that Plaintiff also suggests that charging him for medical copayments or medications is inappropriate under the Eighth Amendment, such a claim also fails as a matter of law. Such charges are required by DOC policy. Commonwealth Defs.' Mot. Summ. J. at Ex. G, DOC Policy Statement DC-ADM 820, Co-Payment for Medical Services. The Third Circuit has held that charging an inmate for medical services or medication does not violate the Eighth Amendment so long as such a policy does not "condition provision of needed medical services on an inmate's ability to pay." Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997) (quoting Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 347). In Reynolds v. Wagner, the Third Circuit explained that "[a]lthough it is possible that . . . fee-based programs [such as this one] may cause some prisoners to refrain from seeking medical treatment as early as they might otherwise do so, the deliberate indifference standard of Estelle does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society." Id. at 175. Here, Plaintiff has not alleged that the medical fees rendered him unable to obtain treatment for serious medical

needs and indeed the record shows that Plaintiff received a
great deal of medical treatment throughout his incarceration.

Similarly, Plaintiff appears to suggest that prison
medical staff withheld or delayed certain medical treatments due
to cost considerations. See, e.g., Gannaway Dep. at 72:9-17 ("Q:
Do you know why you haven't gotten that staple removed from your
incision today? A: They insist that it's too costly . . . .");
id. at 118:8-14 ("At one point in time they had it set up where
they was going to send me to an outside doctor. Then, they
decided--I don't know if it was too financial burden, too
costly. They just decided not to do it."). Plaintiff maintains
this position in his response to Defendants' summary judgment
motions, stating that he is entitled to the "same standard of
care" as an "individual in a priv[]ate hospital" and that
Defendants' efforts to "save money is an act of deliberate
indifference." Pl.'s Obj. ¶ 4. This claim also fails as a matter
of law, because weighing costs when making decisions about a
prisoner's medical treatment does not show deliberate
indifference.

The Third Circuit has held that prisoners do not have
a constitutional right to limitless medical care, free of the
cost constraints under which law-abiding citizens receive
treatment. Reynolds, 128 F.3d at 175 ("[T]he deliberate
indifference standard of Estelle does not guarantee prisoners

the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society."); Caines v. Hendricks, No. 05-1701, 2007 WL 496876, at *8 (D.N.J. Feb. 9, 2007) ("[I]t is not a constitutional violation for prison authorities to consider the cost implications of various procedures, which inevitably may result in various tests or procedures being deferred unless absolutely necessary."), cited with approval in Winslow v. Prison Health Servs., 406 F. App'x 671, 674-75 (3d Cir. 2011) (nonprecedential).

For the above reasons, Plaintiff's Eighth Amendment deliberate indifference claim fails as a matter of law, and summary judgment will be granted in favor of the Commonwealth Defendants on this issue.

> 2. Violation of the Due Process Clause of the Fourteenth Amendment Claim Against All Commonwealth Defendants

As an initial matter, while Plaintiff appears to bring a due process claim against all of the Commonwealth Defendants, he makes specific allegations only as to Defendants McHenry, Detwiler, Sutton, and Hex. Because § 1983 claims cannot proceed against a state actor unless he or she had personal involvement in the alleged violation and there is no dispute of fact as to whether any of the remaining Commonwealth Defendants had any

personal involvement in the alleged due process violations, those remaining Defendants are entitled to judgment as a matter of law on any Fourteenth Amendment claim. Accordingly, summary judgment will be granted in favor of all Commonwealth Defendants with the exception of Defendants McHenry, Detwiler, Sutton, and Hex on this ground.

The due process violations alleged by Plaintiff seem to stem from two different issues: (1) falsified misconduct charges that resulted in Plaintiff being placed in the restricted housing unit, and (2) the confiscation and destruction of Plaintiff's property. Am. Compl. ¶¶ 14, 24, 28, 36; Gannaway Dep. at 164:17-166:20.

First, Plaintiff claims that his due process rights were violated when Defendants McHenry and Detwiler made false misconduct charges against him, and Defendant Hex upheld those false charges and sentenced Plaintiff to the RHU.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. When bringing a § 1983 suit based on a violation of the Fourteenth Amendment, the plaintiff must identify or allege the deprived protected interest. Sample v. Diecks, 885 F.2d 1099, 1113 (3d Cir. 1989). Without the presence of a protected interest, a § 1983 due process claim simply cannot stand. Id. The Third Circuit has

recognized that "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." Burns v. Pa. Dep't of Corr., 642 F.3d 163, 171 (3d Cir. 2011) (citing Sandin v. Conner, 515 U.S. 472, 483-84 (1995)). Only if the sanction "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" is a protected liberty interest implicated. Sandin v. Conner, 515 U.S. 472, 484 (1995). The Third Circuit has found in a nonprecedential decision that sanctioning an inmate to as much as 360 days in the restricted housing unit for misconduct does not implicate due process. Diaz v. Canino, 502 F. App'x 214, 218 (3d Cir. 2012) (nonprecedential).

Here, Plaintiff received four misconduct charges during his incarceration at SCI-Rockview and was sanctioned to disciplinary custody in the RHU for periods between thirty to ninety days for each incident--timespans far below the 360-day sanction found not to trigger a liberty interest in Diaz. Moreover, in his Amended Complaint and during his deposition, Plaintiff did not provide any bases for comparing the conditions of RHU custody with general prison population conditions such that the Court could determine that conditions he experienced while in the RHU were "atypical" of "the ordinary incidents of

prison life." Sandin, 515 U.S. at 484. Accordingly, because Plaintiff has not shown any material facts suggesting that his liberty interests were affected by confinement in the RHU, his Fourteenth Amendment claim on these grounds fails as a matter of law.

Next, to the extent that Plaintiff claims that Defendants McHenry and Detwiler falsified misconduct reports, such conduct does not qualify as a constitutional violation. The Third Circuit has held that "due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly falsified evidence and groundless misconduct reports." Smith v. Mensinger, 293 F.3d 641, 653-54 (3d Cir. 2002). Therefore, "so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim." Id. Here, Plaintiff was afforded a hearing for each misconduct charge, and DOC policy provided him the opportunity to appeal his disciplinary confinement. Accordingly, Plaintiff's mere allegations of falsified reports by Defendants McHenry and Detwiler are insufficient to make out a due process claim against them.

The Court next turns to Plaintiff's allegations that certain Commonwealth Defendants confiscated his property without affording him due process. The Supreme Court has held that "an

unauthorized intentional deprivation of property by a state
employee does not constitute a violation of the procedural
requirements of the Due Process Clause of the Fourteenth
Amendment if a meaningful postdeprivation remedy for the loss is
available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). Thus,
"the state's action is not complete until and unless it provides
or refuses to provide a suitable postdeprivation remedy." Id.
The Third Circuit has previously found, in a nonprecedential
opinion, that the DOC's grievance system is an adequate post-
deprivation remedy. See, e.g., Dockery v. Beard, 509 F. App'x
107, 114 (3d Cir. 2013) (nonprecedential) ("We agree that
[Plaintiff] received adequate due process for the
deductions . . . taken from his account because he took
advantage of an adequate post-deprivation remedy--the grievance
process--to challenge these assessments."). Moreover, where
inmates have alleged they were deprived of their in-cell
property and the property has not been returned to them through
the grievance process, the Third Circuit has noted that adequate
post-deprivation remedies are available to those inmates through
state tort law, such as a conversion action. Id. at 113-14
(citing Daniel v. Williams, 474 U.S. 327, 328 (1986); Hudson,
468 U.S. at 517, 533); see also 42 Pa. Cons. Stat. Ann. §
8522(a), (b)(3) (waiving sovereign immunity with respect to a
common law action for conversion against the Commonwealth).

Here, Plaintiff alleged that he was wrongly charged somewhere between $37 and $80 for failing to return a library book upon leaving SCI-Camp Hill; Defendants McHenry and Detwiler confiscated his art supplies during a cell search; Defendant McHenry destroyed Plaintiff's food items, books, and long underwear while he was in the RHU; and Defendant McHenry later destroyed Plaintiff's food items, sneakers, and art supplies while he was in the RHU on a separate occasion.

As an initial matter, Plaintiff has not proffered any evidence to suggest that his property was actually taken, whether intentionally or negligently.[16] But even if Plaintiff had demonstrated that his property was seized by certain Commonwealth Defendants, Plaintiff was provided an adequate post-deprivation remedy--the prison grievance system. The record shows that Plaintiff actually filed grievances with respect to all of the property he claims was taken, with the exception of

---

[16]     For example, Plaintiff seems to waver as to the amount he was charged for failing to return the library book, and it appears that he did not file a grievance as to these charges. Additionally, Plaintiff's art supplies were confiscated as contraband during a cell search, because he did not have a valid art permit. Plaintiff failed to list the food items, book, and thermal underwear, which he claims were taken by Defendant McHenry while he was in the RHU, on a property inventory sheet for inmates entering the RHU. Further, Plaintiff failed to report these items as missing upon his return to the general prison population from the RHU.

the library book fees. Commonwealth Defs.' Mot. Summ. J. Exs. D-6, at 13, Grievance No. 378425; D-5, at 14, Grievance No. 421116; D-2, at 52, Grievance No. 504672. Although these grievances were denied as unfounded, Plaintiff had the option to pursue further appeals but elected not to do so in all but one instance.

For the reasons discussed above, summary judgment will be granted in the Commonwealth Defendants' favor as to Plaintiff's Fourteenth Amendment due process claims.

### 3. First Amendment Retaliation Claims Against All Commonwealth Defendants

Once again, as an initial matter, Plaintiff's general First Amendment retaliation claims against all of the Commonwealth Defendants must fail, because a § 1983 claim cannot proceed against a state actor unless he or she has personal involvement in the alleged violation. With respect to his retaliation claims, Plaintiff makes specific allegations against only Defendants Notarfrancesco, Detwiler, McHenry, Klaus, Gimble, Horner, and Guyton. He did not mention any other defendant in his Amended Complaint or at his deposition. Accordingly, Plaintiff's retaliation claim as to all other Commonwealth Defendants must be dismissed as a matter of law.

The Court now considers the substance of Plaintiff's remaining retaliation claims. Plaintiff appears to allege that

his transfer from SCI-Camp Hill to SCI-Greene, his later
transfer from SCI-Greene to SCI-Rockview, and the fabrication of
misconduct charges against him at SCI-Rockview were done in
retaliation for grievances he filed.

To prevail on a retaliation claim, the plaintiff must
prove that: (1) he engaged in constitutionally protected
activity, (2) he suffered an adverse action sufficient to deter
a person of ordinary firmness from exercising his constitutional
rights, and (3) his protected conduct was a substantial or
motivating factor in the decision to discipline him. Rauser v.
Horn, 241 F.3d 330, 333-34 (3d Cir. 2001). Once a prisoner
demonstrates that his exercise of a constitutional right was a
substantial or motivating factor in the challenged decision, the
burden shifts to prison officials, who "may still prevail by
proving that they would have made the same decision absent the
protected conduct for reasons reasonably related to a legitimate
penological interest." Id. at 334. The Third Circuit in Rauser
therefore set forth a "deferential standard" meant to take into
account "that the task of prison administration is difficult,
and that courts should afford deference to decisions made by
prison official, who possess the necessary expertise." Id.
(citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

First, a prisoner's ability to file grievances and
lawsuits against prison officials is a protected activity for

purposes of a retaliation claim. <u>Wicker v. Shannon</u>, No. 09-1629, 2010 WL 3812351, at *6 (M.D. Pa. Sept. 21, 2010) (citing <u>Milhouse v. Carlson</u>, 652 F.2d 371, 373-74 (3d Cir. 1981)). Plaintiff therefore meets the constitutionally protected activity prong.

Second, the Third Circuit has found that "several months in disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights." <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003); <u>see also</u> <u>Smith v. Mensinger</u>, 293 F.3d 641, 653 (3d Cir. 2002) ("We have . . . held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of access to the courts."); <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000) (holding that an allegation that a prisoner was kept in administrative segregation as punishment for filing civil rights complaints stated a retaliation claim). Therefore, although Plaintiff has not proffered support for his assertion that his transfers to other correctional institutions constituted adverse action (e.g., that he was transferred to facilities located farther away from his family and they therefore could not visit him), Plaintiff's allegations that certain correctional officers lodged false misconduct complaints against him resulting in

Plaintiff's placement in the RHU satisfy the adverse action prong.[17]

The Court turns next to Rauser's third prong, which concerns causation. To show a causal link between his constitutionally protected activity and the adverse action, a prisoner must prove "that his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." Rauser, 241 F.3d at 333. To establish the requisite causal connection, the plaintiff usually must prove one of two things: (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" or (2) "a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). If neither showing is made, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation. Id.

_____

[17]    The Court notes that the Commonwealth Defendants' argument concerning whether Plaintiff himself was actually deterred from filing future grievances is irrelevant. Commonwealth Defs.' Mot. Summ. J. at 24-25. "The standard is an objective inquiry, and is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." Fiore v. Holt, 435 F. App'x 63, 68 (3d Cir. 2011) (nonprecedential).

Here, Plaintiff has not set forth any evidence to suggest that his grievances were substantial or motivating factors in any of the prison officials' decisions that he challenges. Nor has he shown an "usually suggestive" proximity in time or "a pattern of antagonism coupled with timing" between any of his grievances and the transfers or misconduct charges. With respect to Plaintiff's transfer from SCI-Camp Hill to SCI-Greene, the decision to transfer Plaintiff was made one day prior to Plaintiff's filing of his first and only grievance while at SCI-Camp Hill. Commonwealth Defs.' Mot. Summ. J. Ex. F, Deborah Alvord Decl. ¶ 4. Accordingly, the grievance could not have been a factor in the transfer decision. Moreover, during his deposition Plaintiff conceded that SCI-Camp Hill was never intended to be his "home jail" and his placement there was always intended to be temporary. Gannaway Dep. at 110:3-5, 113:21-22, 148:11-14. With respect to Plaintiff's transfer from SCI-Greene to SCI-Rockview, the timing of the transfer does not support a causal link, since Plaintiff began submitting grievances at SCI-Greene in or about November 2010 but he was not transferred until late April 2011.

The timing of the misconduct charges also fails to suggest a causal link. None of Plaintiff's misconduct charges at SCI-Rockview occurred after Plaintiff filed a grievance against the officers who initiated the misconduct reports. Plaintiff

filed grievances against these officers only after the misconduct charges had been lodged against him for the very purpose of complaining about the allegedly false misconduct charges. See generally Commonwealth Defs.' Mot. Summ. J. Ex. K.

Finally, even if Plaintiff had satisfied his burden, there is no genuine issue of material fact concerning whether the same decision would not have been made absent Plaintiff's filing of a grievance. Plaintiff's transfers between various state correctional institutions were the product of the DOC's normal procedures for moving inmates. Likewise, the misconduct charges against Plaintiff were sustained after an evidentiary hearing and upheld on appeal as violations of DOC policy concerning inmate conduct. There is nothing in the record that would permit a reasonable inference that the decisions concerning Plaintiff's transfers and placements in the RHU would have been any different absent his filing of grievances. Thus, Plaintiff has not raised a genuine issue of material fact as to Rauser's causation element. As such, summary judgment in favor of the Commonwealth Defendants is appropriate as to this claim.

4.   Violation of Right of Access to Courts Claims
     Against All Commonwealth Defendants

Yet again, as an initial matter, Plaintiff's general allegations that all of the Commonwealth Defendants violated his right of access to the courts will not suffice, since a

plaintiff must show personal involvement by a state actor to proceed with a § 1983 claim against that person. Here, Plaintiff identifies only Defendants Dougherty, Hex, and Riggall in connection with his access to courts claim. Therefore, summary judgment will be granted as to all other Commonwealth Defendants on this claim due to Plaintiff's failure to allege their personal involvement.

Plaintiff's access to courts claim seems to stem from three doings by certain prison employees: (1) denying Plaintiff access to the law library, (2) denying Plaintiff paralegal assistance, and (3) denying Plaintiff fee postage and photocopies.

Although "there is no First Amendment right to subsidized mail or photocopying," Reynolds, 128 F.3d at 183, prisoners have a right of meaningful access to the courts, Lewis v. Casey, 518 U.S. 343, 350-51 (1996). But the right is "not . . . an abstract, freestanding right to a law library or legal assistance," and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Id. at 351 (referencing Bounds v. Smith, 430 U.S. 817, 825 (1977)). Rather, to establish a cognizable access to courts claim, a prisoner must show that he was actually injured, that is, that he was actually hindered in his efforts

to pursue a legal claim. Id. An actual injury is shown only
where a non-frivolous, arguable claim is lost. Christopher v.
Harbury, 536 U.S. 403, 415 (2002).

Here, the summary judgment record shows that Plaintiff
made regular and frequent visits to the law library. See
Commonwealth Defs.' Mot. Summ. J. Exs. D-7, at 28, Grievance No.
342419; D-6, at 38, Grievance No. 362623; D-6, at 36, Grievance
No. 364705; D-1, at 29, Grievance No. 522695. Although Plaintiff
was denied access to the law library at certain times, denial
was generally due to his own failure to report for a library
pass in accordance with prison procedures. E.g., id. Ex. D-1, at
16. At other times, Plaintiff's requests for extra time outside
of normal library hours were denied, because pursuant to DOC
policy, extra time was afforded to only those inmates with
impending court deadlines. See, e.g., id. Ex. D-6, at 36,
Grievance No. 364705. With respect to paralegal assistance, DOC
policy provides that paralegal assistance is available to only
those inmates who are illiterate or who do not speak or read
English. See at Exs. D-6, at 2, Grievance No. 385621; D-5, at
55, Grievance No. 387788.

Moreover, Plaintiff has not shown that he suffered any
actual injury from denial of access to the law library or
paralegal assistance. Dockets from Plaintiff's civil rights
cases show that the courts granted Plaintiff extensions of time

87

to file documents whenever requested, and Plaintiff does not allege that he was unable to complete specific filings in these cases. See Commonwealth Defs.' Mot. Summ. J. at Exs. H-J. While Plaintiff suggests that his excessive force case against the Reading Police Department was dismissed for his inability to prosecute the case, the summary judgment record shows otherwise. Plaintiff's case, Gannaway v. Karetas, was dismissed after Plaintiff responded to the defendants' motion for summary judgment and the court granted summary judgment in favor of the defendants as to all claims. Gannaway v. Karetas, No. 09-2688, 2011 WL 1196872, at *4 (E.D. Pa. Mar. 31, 2011). Summary judgment in favor of the defendants in that case was ultimately affirmed by the Third Circuit. Gannaway v. Karetas, 438 F. App'x 61, 68 (3d Cir. 2011) (nonprecedential).

        For the above reasons, summary judgment will be granted in favor of the Commonwealth Defendants on Plaintiff's access to courts claim.

## IV.  PLAINTIFF'S REQUESTS FOR COUNSEL

        Throughout this case, Plaintiff has made repeated requests for the appointment of counsel. The Court has stated that it would reassess Plaintiff's requests after Defendants' motions for summary judgment had been fully briefed, at which time it would be able to properly

consider the factors for appointment of counsel in a civil action set forth in Tabron v. Grace, 6 F.3d 147, 155-57 (3d Cir. 1993). See, e.g., Oct. 14, 2015 Order at 1 n.2 (ECF No. 141). Therefore, these requests are now ripe for disposition.

A federal district court has broad discretion in determining whether an indigent civil litigant should be appointed counsel. Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002). In Tabron v. Grace, the Third Circuit set forth criteria that district courts should use when determining if appointment of counsel is appropriate. 6 F.3d at 155-57. As a threshold matter, the court must determine if the plaintiff's case has "some merit in fact or law." Id. at 155. Thereafter, the court must assess the following:

> (1) the plaintiff's ability to present his or her own case;
>
> (2) the difficulty of the particular legal issues;
>
> (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation;
>
> (4) the plaintiff's capacity to retain counsel on his or her own behalf;
>
> (5) the extent to which a case is likely to turn on credibility determinations; and

> (6) whether the case will require testimony from
>     expert witnesses.

Id. at 155-57.

Upon examination of the Tabron factors, the Court concludes that the appointment of counsel is not warranted in this case. Having granted summary judgment in favor of the moving defendants as to all claims, Plaintiff has not hurdled the initial threshold requiring the case to have arguable merit in fact or law.

## V.    REMAINING DEFENDANTS

Having dismissed all claims against those defendants who have joined in the summary judgment motions, the Court next turns to those defendants who have not yet responded. Defendants who have not responded fit into four categories:

1.    Defendants upon whom the U.S. Marshal could not effectuate service: Jeffrey Ditty, Fox, Emil Michael Kazor, Gail Kelly, Teresa Law, Lizhong, Marsh, John A. Palakovich, April Palumbo Rasch, Mark Silidker, Richard Southers, Weaver, Doris Weaver, MD Peter Binnion, Fisher, Symons, Goubran Theodore Vourstand, and Ted W. Williams;

2.    Defendants who were served but who have not entered an appearance: Nicholas Stroumbakis and William Bispels;

90

3.  Defendants on whom service was not attempted: "(PHS
    Correctional Healthcare) Most of State Prison,"
    Bernard, Sgt. Vargas, Deputy Horton, Deputy, C/O
    Moore, Kitchen Worker Luss, and E. Mosser; and

4.  Defendants who have not been identified: two Jane Does
    and a John Doe.

Two statutes permit the Court to consider the merits of Plaintiff's claims against these defendants at this juncture. First, as to actions filed by a plaintiff proceeding in forma pauperis, 28 U.S.C. § 1915(e)(2) provides that "the court shall dismiss at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Second, the PLRA provides that

> [t]he court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from suit.

42 U.S.C. § 1997e(c)(1).

As listed above, there remain a number of defendants who could not be identified. Additionally, the U.S. Marshal was

unable to serve other defendants, because his or her purported employer--PrimeCare Medical or the Commonwealth--stated that the defendant was unknown to it or that it believed the defendant's name was incorrectly pled. See, e.g., Summons Returned Unexecuted, ECF No. 40.

It is appropriate at this juncture to dismiss without prejudice those defendants who have not yet been identified and served. The rules concerning pleading fictitious defendants seem applicable here: "[I]t clear that, if after a reasonable period of discovery a plaintiff has not identified the fictitious defendant, the court may dismiss the fictitious defendant." Martin v. Comunale, No. 03-6793, 2006 WL 208645, at *13 (E.D. Pa. Jan. 18, 2006) (citing Agresta v. City of Philadelphia, 694 F. Supp. 117, 119 n.1 (E.D. Pa. 1988)).

Here, the summary judgment record suggests that even if afforded discovery, Plaintiff would be unable to identify those defendants who remain unknown or to glean information that would help the U.S. Marshal to locate and serve those defendants. At his deposition, Plaintiff could not recall most of the individual defendants or what each had done to violate his constitutional rights. Instead, he stated that he named each person listed in the Amended Complaint because he saw the person's name on certain documents he had in his possession and he or she was in a "supervisory or authoritative position,"

Gannaway Dep. at 153:5-154:9, had "some control or [was] in
control" somehow, id. at 165:19-23, or otherwise was "part of
that one corrupted body," id. at 158:2-3. See also id. at 86:10-
88:23 (indicating that he could not recall those individual
defendants employed by PrimeCare Medical). Moreover, to the
extent that Plaintiff alleges the same violations of his
constitutional rights or brings the same state-law tort claims
against the unidentified defendants as he does against those
defendants who moved for summary judgment, the Court has
determined that Plaintiff's claims are without merit.

        As for those defendants who were served but who have
not filed anything in this case, Defendants Stroumbakis and
Bispels--Plaintiff's court-appointed attorneys at various points
during the armed robbery criminal proceedings--the Court will
dismiss the claims against them for failure to state a claim.
Although Plaintiff's allegations against them are not entirely
clear, it seems unlikely that Plaintiff could sufficiently plead
claims against Defendants Stroumbakis and Bispels. Court-
appointed attorneys are generally not considered state actors
for purposes of § 1983 liability, and Plaintiff would be hard-
pressed to show that he was innocent of all criminal charges
against him, as required to make out a claim for legal
malpractice under Pennsylvania law in connection with
representation in a criminal case. See supra subsections

III.D.1-2 (discussing Plaintiff's § 1983 and legal malpractice claims against Defendant Deming).

For these reasons, the Court will dismiss all remaining claims against all remaining defendants based on 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

## VI.   CONCLUSION

For the reasons stated above, the Court will grant in full the motions for summary judgment filed by the PrimeCare Medical Defendants, the ADAPPT Defendants, the Berks County Public Defender's Office, Deming, and the Commonwealth Defendants. Plaintiff's requests for the appointment of counsel are denied. The Court will also dismiss the remaining twenty-nine defendants who have not been served, could not be identified, or failed to enter an appearance in this case under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).